**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff–Appellee,**

v.

**HACIENDA HOTEL,
Defendant–Appellant.**

No. 88–5563.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 8, 1988.

Decided Aug. 10, 1989.

Myron E. Harpole, Witter and Harpole, Los Angeles, Cal., for defendant-appellant.

Donna J. Brusoski, E.E.O.C., Washington, D.C., for plaintiff-appellee.

Before HALL, WIGGINS and THOMPSON, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

On May 30, 1986, the Equal Employment Opportunity Commission ("EEOC" or "the Commission") initiated this employment discrimination action against appellant Ha-

cienda Hotel ("Hacienda" or "the Hotel"), an establishment operated by Las Freres Hacienda in El Segundo, California, pursuant to 42 U.S.C. § 2000e–5(f)(1)(1982). The Commission alleged that the Hacienda, its General Manager (Frank Godoy), its Executive Housekeeper (Alicia Castro), and its Chief of Engineering (William Nusbaum), had engaged in unlawful employment practices against female employees in the Hacienda housekeeping department by sexually harassing them, terminating them when they became pregnant, failing to accommodate their religious beliefs, and retaliating against them for opposing Hacienda's discriminatory practices. Relief was sought and obtained on behalf of five current and former Hacienda maids, all but one of whom were undocumented aliens, who were alleged to have been victims of appellant's discriminatory employment practices during 1982 and 1983. We affirm.

## I

The Hotel hired Teodora Castro in June 1980. Teodora became pregnant in late 1981 and continued to work for defendant. During the course of her pregnancy, both Alicia Castro and Nusbaum made numerous crude and disparaging remarks regarding her pregnancy. Nusbaum, for example, told Teodora that "that's what you get for sleeping without your underwear,"; he also asked why she was pregnant by another man and made comments about her "ass." Nusbaum often subjected her to sexually offensive remarks in the presence of Alicia Castro, who merely laughed. Alicia Castro herself told Teodora that she did not like "stupid women who have kids," and on many occasions called her a "dog" or a "whore" or a "slut."

In late 1981 and early 1982, Teodora Castro complained to Frank Godoy and Jose Ortiz, the union representative, about Nusbaum's and Alicia Castro's comments, but the situation did not improve. On June 30, 1982, Teodora Castro was terminated, as Alicia Castro admitted in her deposition and at trial, because of her pregnancy. She was rehired in November 1982, following the birth of her child.

Teodora Castro is also a Seventh Day Adventist who observes the Sabbath on Saturdays. Prior to her termination, she had been given Saturdays off. After she was rehired in November 1982, however, Alicia Castro informed her that she would have to work Saturdays. Teodora reminded the Executive Housekeeper that she needed Saturdays off in order to observe her Sabbath, but Alicia Castro denied her request. On December 17, 1982, Alicia Castro terminated Teodora for refusing to work on her Sabbath. During this time period, another maid in the Housekeeping Department, who was less senior than Teodora, was permitted to have both Saturdays and Sundays off after she had been attacked on the way home from work while waiting for public transportation, which was inadequate on weekends.

Following her termination, Teodora immediately sought employment. After another pregnancy, followed by childbirth in December of 1983, she finally secured new employment at another hotel in the vicinity of the Los Angeles International Airport in May, 1984. Between May 1984 and the date of trial, Teodora Castro earned less than she would have earned had she remained employed by the Hacienda.

Maria Elena Gonzalez was a maid in the Hacienda Housekeeping Department from October 27, 1980, to September 21, 1983. Gonzalez is a Jehovah's Witness and observes her Sabbath on Sundays. In early September, 1982, Gonzalez requested that she be given Sundays off in order to observe the Sabbath. Alicia Castro initially granted Gonzalez's request; two days later she changed her mind and told Gonzalez that she had to work Sundays or quit.

Gonzalez filed a union grievance complaining of Castro's refusal to accommodate her religious beliefs. Gonzalez also informed the General Manager of the Hacienda Hotel, Frank Godoy, of Alicia Castro's refusal to adjust her schedule. Godoy told Gonzalez that he would speak with Castro regarding her request. Alicia Castro subsequently told Gonzalez that because she had complained to Godoy, she would never have Sundays off and that she should be grateful that she had a job. Castro also told Gonzalez that she was going

to "make life so difficult for her that she would not know her head from her feet."

During the month of September, 1982, Castro issued four disciplinary warnings to Gonzalez and terminated her on September 21, 1982. Following her termination, Gonzalez sought other comparable employment until the end of December, 1984.

The Hotel hired Flora Villalobos in April of 1980. After she became pregnant in early 1982, she was regularly subjected to sexually offensive remarks from Alicia Castro and Nusbaum. Castro often called her a "dog" or a "whore," and Nusbaum told her that women "get pregnant because they like to suck men's dicks." On many occasions, Nusbaum threatened to have her fired if she did not submit to his sexual advances. Castro witnessed some of Nusbaum's behavior and laughed at his sexual remarks. On October 31, 1982, when Villalobos was approximately seven months pregnant and still able and willing to work, Castro terminated her employment because of her pregnancy. Villalobos had obtained a statement from her doctor indicating that she was able to continue working until two or three weeks before her estimated delivery date of December 28, 1982.

On February 9, 1983, Villalobos provided Castro a written statement from her doctor indicating that she was able to return to work immediately. Villalobos was not rehired until April 8, 1983. The Hotel hired two maids, one rehire and one new employee, while Villalobos was awaiting rehire.

Leticia Cardona was employed by the Hotel from May 15, 1981, to September 28, 1982. After she became pregnant in early 1982, she was subjected to sexually offensive comments by Alicia Castro and Nusbaum. In September 1982, when Cardona was six months pregnant, Castro told her that she was too fat to clean rooms and fired her on September 28, 1982. Although at trial Castro testified that Cardona was terminated for poor work performance. Castro had previously admitted in a deposition that she terminated Cardona pursuant to her practice of terminating pregnant employees. Cardona's notice of termination form, which was completed by Castro, states that she was terminated because of her pregnancy.

In December 1982, after the birth of her baby, Cardona returned to the Hotel and requested her job back, but Castro refused. Castro testified that Cardona was not rehired because she was a poor worker.

Throughout her term of employment from October 8, 1978, to March 10, 1983, William Nusbaum made sexual advances and offensive sexual comments to Mercedes Flores. Nusbaum regularly offered, for example, to give her money from his paycheck and an apartment to live in if she would "give him [her] body." He also assured her that she would never be fired if she would have sex with him. Flores claimed to have heard Nusbaum make offensive sexual comments to other maids, including complainants Cardona, Castro, and Villalobos. On one occasion, for example, she heard him say to Villalobos: "You have such a fine ass. It's a nice ass to stick a nice dick into. How many dicks have you eaten?"

Each of the five complainants, on whose behalf the EEOC sought relief, filed a charge with the Commission within 300 days of the unlawful employment practice to which they claimed to have been subjected. All but Teodora Castro's pregnancy and sexual harassment claims were filed with the EEOC within 240 days of the alleged unlawful employment practice. None of the complainants filed a charge directly with the California Department of Fair Employment and Housing ("DFEH"). Under the terms of a worksharing agreement, however, the EEOC and DFEH have each designated the other as the other's agent for the purpose of receiving charges. Pursuant to the same worksharing agreement, the EEOC referred each of the charges to DFEH who then notified appellant that the EEOC would be handling the investigation into the employees' allegations.

On February 17, 1987, the district court heard the EEOC's motion for partial summary judgment on the issue of appellant's liability for pregnancy discrimination. The district court concluded that the Hacienda's

practice of terminating pregnant employees, while granting leaves of absence and reinstatement upon recovery to other "temporarily disabled" employees, violated § 703(a) of Title VII, 42 U.S.C. § 2000e–2(a). The court entered partial summary judgment in favor of the Commission with respect to Castro's, Cardona's, and Villalobos' pregnancy claims on March 2, 1987.

The remaining issues were tried before the court from September 21 to 25, 1987. After trial, the district court entered judgment for the EEOC, based on the following findings and conclusions. The court first rejected Hacienda's defense that the charges were not timely filed. On the merits, the court held that Castro's and Gonzalez' religious discrimination claims, and Gonzalez' retaliation claims had been established by a preponderance of the evidence. The court also found the sexual harassment claims supported by the evidence and concluded that the Hacienda was liable for the conduct of Alicia Castro and William Nusbaum, and for the failure of Frank Godoy to take prompt remedial action upon learning of the employees' allegations. The court also reaffirmed it prior summary judgment with respect to Castro's, Cardona's, and Villalobos' pregnancy discrimination claims.

The district court awarded backpay as follows: (1) to Villalobos for the period between her termination on October 31 and November 30, 1982, the date on which her doctor advised her to stop working, and for the period between February 10 and April 8, 1983, during which Hacienda knew of her readiness to return to work but failed to reinstate her; (2) to Teodora Castro for the period between December 17, 1982, when she was fired in violation of Title VII's prohibition of religious discrimination until May of 1984, when she found new employment; and (3) to Gonzalez for the period between her date of termination, September 21, 1982, and December of 1983, a period the court deemed "sufficient" in light of her duty to mitigate damages. In addition, the court enjoined the Hacienda from any further discrimination on the basis of gender, religion, and opposition to unlawful employment practices.

On timely appeal from this judgment, the Hacienda contends that the district court erred by: (1) rejecting its statute of limitations defense; (2) entering partial summary judgment on the issue of appellant's liability for pregnancy discrimination; (3) finding that the Hacienda failed to reasonably accommodate its employees' religious beliefs and terminated an employee in retaliation for opposing her employer's religious discrimination; (4) concluding that appellant was liable for the acts of its supervisory personnel who were found to have sexually harassed maids in the Hacienda housekeeping department; (5) awarding excessive backpay to three of the claimants who are undocumented aliens; and (6) granting the EEOC a permanent injunction against future gender-based, religious, or retaliatory discrimination.

## II

Before reaching the merits of the instant appeal, we must decide whether the claimants timely filed an appropriate charge with the relevant state and federal administrative agencies to initiate this Title VII action. Whether the district court correctly concluded that the claimants' charges of employment discrimination were timely filed is primarily a matter of statutory construction; such questions of law are reviewable de novo by this court. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.1984) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

The limitations periods for Title VII claims were established by sections 706(c) and (e) of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e–5(c) and 2000e–5(e). Under those provisions, a complainant must file a charge of employment discrimination with the EEOC within 180 days of the alleged unlawful employment practice, *except that* if a complainant has *"initially instituted* proceedings with a State or local agency with authority to grant or seek relief from such practice[s]," the complainant may file a charge with the EEOC within 300 days of the alleged discrimination. 42 U.S.C. § 2000e–5(e). Where there exists concurrent jurisdiction between a state or local agency and the EEOC, as in Califor-

nia, however, a charge is not deemed to be filed with the EEOC "before the expiration of sixty days after proceedings have been commenced under ... State or local law, unless such proceedings have been earlier terminated." 42 U.S.C. § 2000e–5(c).

Each complainant in this case filed a charge with the EEOC within 300 days of the unlawful employment practice to which they were allegedly subjected. Hacienda argues, however, that all of those charges, with one exception, were untimely because the shorter 180–day statute of limitations applies. The gist of appellant's argument is that complainants did not "initially institute" these proceedings in the California DFEH because, by virtue of an EEOC–DFEH worksharing agreement, the state agency waived in advance its 60–day exclusive processing period.

If this court had nothing but the text of 42 U.S.C. §§ 2000e–5(c) and (e) on which to base its holding, appellant's argument might have some merit. There can be little doubt, however, that after the Supreme Court decision in *EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988), we must reject appellant's statute of limitations defense.

In *Commercial Office Products*, the Court was asked to decide whether the district court had jurisdiction over a Title VII action in which the complainant initially filed a charge with the EEOC 290 days after the date of the alleged discrimination, and well after the state's applicable 180–day statute of limitations had run. The Court held that the complainant's charge had been timely filed within the 300–day limitations period found in 42 U.S.C. § 2000e–5(e) because a waiver, executed

pursuant to an EEOC–State worksharing agreement by which the relevant state agency gave up its right to an exclusive 60–day period for processing the charge, "terminated" the state proceedings for purposes of 42 U.S.C. § 2000e–5(c). 108 S.Ct. at 1676.

Appellant is correct in asserting that the *Commercial Office Products* Court did not directly address the issue as framed by appellants in this case, *i.e.*, whether state proceedings may be "initially instituted" within the meaning of 42 U.S.C. § 2000e–5(e) notwithstanding the state's advance waiver of initial charge-processing in an EEOC–State agency worksharing agreement. The EEOC is also correct, however, that the Supreme Court seems to have decided the question by necessary implication. Had state proceedings not been "initially instituted" by virtue of the EEOC's referral of the charge in *Commercial Office Products* to the state agency, there would have been no state proceedings to "terminate" within the meaning of 42 U.S.C. § 2000e–5(c), and the 300–day statute of limitations would have been inapplicable.[1]

As in *Commercial Office Products*, the EEOC in this case referred copies of the claimants' charges to the state agency. That is sufficient to "institute" proceedings with the state agency within the meaning of section 2000e–5(e). *See Commercial Office Products*, 108 S.Ct. at 1669 ("The EEOC's referral of a charge initially filed with the EEOC to the appropriate state or local agency properly institutes the agency's proceedings within the meaning of the Act...."); *Love v. Pullman*, 404 U.S. 522, 525–26, 92 S.Ct. 616, 618, 30 L.Ed.2d 679 (1972).[2] Accordingly, the district court did

---

1. Prior to the Supreme Court's decision in *Commercial Office Products*, only one court of appeals had adopted Hacienda's view. *See Dixon v. Westinghouse Electric Corp.*, 787 F.2d 943, 945–46 (4th Cir.1986); *EEOC v. Ocean City Police Dept.*, 820 F.2d 1378, 1380 n. 3 (4th Cir. 1987). *Dixon* and *Ocean City* were vacated by the Supreme Court and remanded for reconsideration in light of *Commercial Office Products.* — U.S. ——, 108 S.Ct. 1990, 100 L.Ed.2d 223 (1988). Upon reconsideration, the Fourth Circuit concluded that the earlier decisions were in error. *See Dixon v. Westinghouse Electric Corp.*, 857 F.2d 945 (4th Cir.1988).

We note also that other courts have taken an approach similar to the one we today adopt, and have expressly rejected the now-repudiated *Dixon* rationale. *See, e.g., McKelvy v. Metal Container Corp.*, 854 F.2d 448, 451 n. 6, 453 n. 11 (11th Cir.1988) (ADEA action); *Gilardi v. Schroeder Trucking*, 833 F.2d 1226, 1231–32 (7th Cir.1987).

2. We also note that the Court in *Commercial Office Products* held the 300–day federal limitations period applicable to the claimants' Title VII claims, even though a simultaneously filed state charge would have been untimely. 108

not err in rejecting appellant's statute of limitations defense.

## III

We review de novo the district court's partial summary judgment on the issue of appellant's liability for pregnancy discrimination. *EEOC v. County of Orange,* 837 F.2d 420, 421 (9th Cir.1988). Viewing the evidence in the light most favorable to the nonmoving party, the Hacienda in this case, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

Section 701(k) of Title VII, as amended in 1978 by the Pregnancy Discrimination Act ("PDA"), makes it unlawful for an employer to discharge or otherwise discriminate against a woman because she is pregnant. 42 U.S.C. §§ 2000e(k) and 2000e-2(a) (1982). The legislative history of the PDA emphasizes that pregnant women "who are able to work must be permitted to work on the same condition as other employees; and when they are not able to work for medical reasons ... must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working." S.Rep. No. 331, 95th Cong., 2d Sess. 3–4 (1977).

The district court concluded that the Hacienda's practice of terminating pregnant maids, rather than allowing them to take leaves of absence, violated these statutory provisions. Alicia Castro admitted that it was her practice to terminate pregnant employees rather than permit them to take temporary leaves of absence, although she did not terminate other employees who were similarly temporarily disabled because of illness or injury. Alicia Castro specifically admitted that she terminated claimants Castro, Villalobos, and Cardona because of pregnancy.

Appellant argues that it should not be held liable for pregnancy discrimination because no one suffered any "damage" as a result of an application of the discriminatory policy. In particular, appellant contends that Teodora Castro and Villalobos [3] were rehired following their pregnancies without loss of seniority or other benefits, while Cardona [4] would not have been reinstated in any event because of her poor work performance.

As stated in its opening brief, the Hacienda's view of its employees' pregnancy discrimination claims is "no harm, no foul." Beyond the cavalier attitude such statements convey, appellant's argument evidences an almost total misapprehension of the purposes and operation of federal employment discrimination law. In the first place, appellant's argument is meritless because the EEOC's motion for partial summary judgment was expressly limited to liability, reserving questions regarding relief until after trial. As the EEOC points out, appellant is confusing the liability determination with the relief phase of an appropriately bifurcated Title VII action.

Even if no employee suffered a "tangible loss" of an "economic nature," *i.e.,* a loss of seniority or· wages or other monetarily quantifiable employment benefits, appellant's implementation of a policy or practice under which pregnant employees were treated differently from other

---

S.Ct. at 1675. If state proceedings were "initially instituted" by the charge in *Commercial Office Products,* upon which the state could not have acted, they plainly were instituted in the instant case by a charge upon which the state chose not to act.

3. The district court awarded relief to Villalobos on her pregnancy discrimination claim because she was fired before her doctor deemed her disabled and was not rehired until weeks after her doctor released her to return to work. The Hotel admits that two maids, one rehire and one new employee, began working while Villalobos was awaiting rehire. The Hotel appears to suggest that Villalobos' early discharge was

justified because her pregnancy interfered with her job performance. However, Hacienda made no attempt to establish that non-pregnancy was a bona fide occupational qualification for the maid position. *See Carney v. Martin Luther Home,* 824 F.2d 643, 648–49 (8th Cir. 1987). The bona fide occupational qualification defense is essentially an affirmative defense. *See id.* Appellant's attempt to establish this defense comes too late.

4. The district court found that it was fairly certain that Cardona was not rehired because of poor performance. Accordingly, the district court did not award Cardona any back pay on her pregnancy discrimination claim.

temporarily-disabled employees with similar capacity for work would still be a violation of both the letter and spirit of Title VII's prohibition against pregnancy discrimination. 42 U.S.C. § 2000e(k); and *see Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Appellant overlooks, moreover, the district court's ultimate determination that at least one of the pregnancy discrimination claimants, Flora Villalobos, actually did lose wages because of appellant's discriminatory policy. The district court did not err in entering summary judgment for the EEOC on the issue of Hacienda's liability for pregnancy discrimination.

## IV

■ Whether an employer has met its statutory burden to initiate good-faith efforts to accommodate an employee's religious belief is a question of fact. *TWA v. Hardison,* 432 U.S. 63, 77, 97 S.Ct. 2264, 2273, 53 L.Ed.2d 113 (1977). Such findings of fact shall not be set aside unless clearly erroneous. *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

Title VII prohibits an employer from failing to hire, refusing to hire, or discharging any individual because of her religion. 42 U.S.C. § 2000e–2(a)(1). The term "religion" is defined as follows:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, *unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.*

42 U.S.C. § 2000e(j) (emphasis added).

**5.** "Undue hardship" is determined on a case by case basis in an effort to seek an equitable application of these guidelines to the variety of situations which arise due to varied religious practices of the American people. *TWA,* 432 U.S. at 72, 97 S.Ct. at 2270–71.

**6.** During the trial, Alicia Castro testified that neither employee explicitly requested time off for religious purposes. This statement contradicted Alicia's deposition testimony wherein she stated that Teodora had notified her that the request was because of her religious practices.

■ To establish a prima facie case of religious discrimination under sections 2000e–2(a)(1) and 2000e(j), the plaintiff has the burden of pleading and proving that (1) she had a bona fide religious belief; (2) she informed her employer of her religious views and that they were in conflict with responsibilities as an employee; and (3) she was threatened with or subjected to discriminatory treatment, such as discharge, for her inability to fulfill the disputed job duty. *Anderson v. General Dynamics Convair Aerospace Div.,* 589 F.2d 397, 401 (9th Cir.1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979).

■ Once the employee has established a prima facie case, the burden shifts to the employer to prove that it made good faith efforts to accommodate the employee's religious beliefs. *Id.* at 401; *see also EEOC v. Townley Engineering & Mfg. Co.,* 859 F.2d 610, 615 (9th Cir.1988) ("burden of attempting an accommodation rests with the employer rather than the employee"). The employer must show that it has taken "some initial steps to reach a reasonable accommodation of the particular religious belief at issue." *American Postal Workers Union v. Postmaster General,* 781 F.2d 772, 776 (9th Cir.1986); *Burns v. Southern Pacific Transp. Co.,* 589 F.2d 403, 406 (9th Cir.1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979). If the employer does not propose an accommodation, the employer must accept the employee's proposal or demonstrate that the proposal would cause the employer undue hardship.[5] *Townley,* 859 F.2d at 615.

■ The district court found that Teodora Castro and Maria Elena Gonzalez informed Alicia Castro of their religious beliefs[6] and requested that their schedules be

"When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. Bessemer City,* 470 U.S. at 575, 105 S.Ct. at 1512. The district court plainly chose to disbelieve Alicia Castro's statements that neither employee explicitly requested time off for religious purposes.

adjusted such that they would have a day off on their Sabbath, that their supervisor, Alicia Castro, denied their requests, threatening them with discharge if they did not work on their Sabbath, and that Teodora Castro was actually dismissed for refusing to work on her Sabbath. These findings are not clearly erroneous; they are, moreover, clearly sufficient to establish appellee's prima facie case of religious discrimination.

The district court also found that the Hacienda made no effort whatsoever to accommodate the religious beliefs of both these women. Alicia Castro admitted that she never asked any maid if they would volunteer to work nor did she make any effort to rearrange the schedule of the maids according to the religious needs of the employees within the housekeeping department. The record also reflects that there was at least one voluntary substitute, Teodora's sister, who was willing to work for her. Hacienda argues, however, that it could not accommodate the women's religious beliefs because any attempt at accommodation would have caused undue hardship on its business. Appellant relies on *TWA v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, for the proposition that, like TWA, it was bound by its union contract to schedule employees on the basis of seniority and cannot, therefore, be held liable.[7]

Appellant's reliance on *TWA* is misplaced. The court in *TWA* addressed the degree of accommodation that was required of an employer within the framework of a seniority system. The court recognized that at a minimum, the employer was required to negotiate with the employee in an effort reasonably to accommodate the employee's religious beliefs. *Id.* at 75, 97 S.Ct. at 2272; *See also Anderson v. General Dynamics Convair Aerospace Div.*, 589 F.2d at 401.

The employer in *TWA*, for example, made several attempts to accommodate the religious practices of the plaintiff, including: (1) holding several meetings to try and solve the problem; (2) an authorized union search for someone who would exchange shifts, which was normal procedure; and (3) an effort to find another job in the company for the employee. *TWA*, 432 U.S. at 77, 97 S.Ct. at 2273.

In the instant case, the district court found that Hacienda did nothing to solve the problem. Appellant essentially used the seniority provision of the collective-bargaining agreement as a shield against its statutory obligation to reasonably accommodate its employees' religious needs. "[n]either a collective-bargaining agreement nor a seniority system may be employed to violate [Title VII]...." *TWA*, 432 U.S. at 79, 97 S.Ct. at 2274.

The district court did not clearly err in finding that the Hacienda failed reasonably to accommodate the religious practices of Teodora Castro and Maria Elena Gonzalez, and that it terminated Teodora Castro because of her religion, in violation of Title VII.

V

We must next decide whether the district court clearly erred in finding that Maria Elena Gonzalez was disciplined and subsequently discharged in retaliation for protesting her supervisor's refusal to reasonably accommodate her religious practice. Section 704(a) of Title VII, 42 U.S.C. § 2000e–3, makes it unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter...."

The elements of a prima facie case for retaliation are set forth in *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346 (9th Cir.1984). The plaintiff must show (1) that she was engaging in a

---

7. Section 2.3 of Hacienda's contract with its union provides that "whenever possible and feasible, seniority shall govern ... work schedules." That this provision was flexibly applied is evidenced by Hacienda's treatment of Edna Herrera, to whom it gave weekends off for non-seniority reasons related to her commute to

work. To the extent that Hacienda provided scheduling consideration for the personal safety concerns of one employee, it cannot discriminatorily deny such consideration for the religious needs of others. *See Hishon v. King & Spalding*, 467 U.S. 69, 75, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984).

protected activity, (2) that she suffered an adverse employment decision, and (3) that there was a causal link between the protected activity and the adverse employment decision. *Id.* at 1354. In the termination context, the employee must show "by a preponderance of the evidence that engaging in the protected activity was one of the reasons for the firing and that but for such activity the plaintiff would not have been fired." *Ruggles v. California Polytechnic State University,* 797 F.2d 782, 785 (9th Cir.1986) (quoting *Kauffman v. Sidereal Corp.,* 695 F.2d 343, 345 (9th Cir.1982)).

Once the employee has established a prima facie case of retaliation, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment decision. *Ruggles* 797 F.2d at 786. If the employer is successful, the plaintiff must then prove by a preponderance of the evidence that the proffered reasons are pretexts for retaliation or that a discriminatory reason more likely motivated the employer's action. *Id.* If the employee succeeds at this point, a presumption is created that the adverse employment decision was the product of retaliatory intent. *Id.* The employer may rebut this presumption by showing by a preponderance of the evidence that the adverse action would have been taken even in the absence of discriminatory or retaliatory intent. *Id.* This final stage in the allocation of proof is essentially a question of causation. *Id.*

The district court found that Maria Elena Gonzalez established a prima facie case of retaliation. The court found that Gonzalez engaged in protected activity when she complained to Frank Godoy about Alicia Castro's refusal to consider accommodating her religious beliefs. When Alicia Castro found out that Gonzalez had spoken with Frank Godoy, she told Gonzalez that now she would never have Sundays off and threatened to make her life very difficult. Within less than a month of her complaint to Godoy, Castro issued three written warnings to Gonzalez and fired her.

Appellant contends, however, that Gonzalez was fired for poor work performance and not for any retaliatory reasons. Hacienda's argument is based on the fact that during trial, Alicia Castro testified that she fired Gonzalez for poor work performance. The court below, however, explicitly found that Alicia Castro was not a credible witness, and that "but for Ms. Gonzalez's attempt to seek accommodation of her religious beliefs, she would not have been disciplined or terminated by Alicia Castro." The district court did not clearly err in concluding that Appellant disciplined and terminated Maria Elena Gonzalez in retaliation for her protest of Alicia Castro's refusal to accommodate her religious practices. *See Anderson v. Bessemer City,* 470 U.S. at 575, 105 S.Ct. at 1512 ("When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses ... that finding, if not internally inconsistent, can virtually never be clear error.").

## VI

We review the district court's factual findings with respect to the employees' sexual harassment claims only for clear error. *Anderson v. Bessemer City,* 470 U.S. 564, 576, 105 S.Ct. 1504, 1512–13, 84 L.Ed.2d 518 (1985); *Jordan v. Clark,* 847 F.2d 1368, 1375 (9th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989). The court's conclusion that the unwelcome sexual conduct was sufficiently severe and pervasive to create a "hostile work environment" for which Hacienda can be held liable, however, is reviewed de novo. *Jordan,* 847 F.2d at 1375 n. 7.

The Supreme Court recently recognized the "hostile or offensive work environment" theory of liability for sexual harassment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *see also Patterson v. McLean Credit Union,* — U.S. —, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989) (racially hostile work environment). To establish a Title VII violation under this theory, a plaintiff must show that: (1) she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual

nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Jordan,* 847 F.2d at 1373.

Appellant raises three challenges to the district court's conclusion that it is liable for sexual harassment in which its employees Alicia Castro and William Nusbaum engaged. First, Hacienda argues that the sexually harassing conduct in which Castro and Nusbaum were proven to have engaged was not sufficiently severe or pervasive to be actionable under Title VII. Appellant also contends that it could not be held liable for the acts of Nusbaum and Castro of which it had no notice. Finally, Hacienda argues that its policy against discrimination and its internal grievance procedures should shield it from liability for sexual harassment. We consider each of Hacienda's contentions in turn.

### A

There is no dispute in this case that the acts of sexual harassment complained of occurred, and that they were unwelcome. The contested issue about a *Jordan* cause of action here is whether the harassment was sufficiently "severe or pervasive" to alter the terms and conditions of the claimants' employment and to create a sexually hostile work environment. As the record reveals, and as the district court found, Nusbaum repeatedly engaged in vulgarities, made sexual remarks, and requested sexual favors from the complainants. The complainants' direct supervisor, Alicia Castro, also frequently witnessed, laughed at, and herself made these types of comments.[8] As the district court also found, Castro had direct authority to hire, discharge, and discipline housekeeping employees, and Nusbaum threatened at least one of the claimants that he would have Castro fire her if she did not submit to his

sexual advances. Upon de novo review of the evidence in this case, we agree with the district court's conclusion that the complainants were subjected to severe and pervasive sexual harassment that "seriously tainted" the working environment and altered the terms and conditions of their employment.

### B

Based on a pre-*Vinson* case, *Miller v. Bank of America,* 600 F.2d 211, 213 (9th Cir.1979), the district court declared that the Ninth Circuit has a rule of *respondeat superior* under which employers are liable for intentional sexual harassment in which supervisory personnel engage in the course of their employment, even where such conduct violates company policy.[9] Applying that standard, the court held that Hacienda can be held liable for Castro's and for Nusbaum's, acts of sexual harassment.

It is unclear how *Vinson* affects the *Miller* rule. In *Vinson,* the Supreme Court declined to adopt a definitive rule of employer liability for the acts of supervisory personnel. 477 U.S. at 72, 106 S.Ct. at 2408. The court did, however, endorse the application of agency principles to decide this issue, and held that lack of notice does not necessarily insulate the employer from liability. *Id.* (citing Restatement (Second) of Agency §§ 219–237 (1958)).

The courts of appeals that have considered this issue since *Vinson* have had a difficult time developing a standard to govern the liability of an employer for sexual harassment perpetrated by its supervisory personnel or by co-workers of the Title VII claimant. *See e.g., Lipsett v. University of Puerto Rico,* 864 F.2d 881, 899–901 (1st Cir.1988); *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1015–16 (8th Cir.1988). The prevailing trend of the case law, however, seems to hold that employers are liable for

---

8. Castro's comments all seemed to be disparaging remarks about the maids' pregnancies. In light of the amendment to Title VII to include pregnancy-based discrimination within the definition of sex-based discrimination, 42 U.S.C. § 2000e(k), these remarks about the claimants' pregnancies can be construed as a form of sexual harassment.

9. To the extent the district court believed, based on *Miller,* that appellant was "strictly liable" for Castro's acts of sexual harassment, *Vinson* casts doubt on the court's determination. 477 U.S. at 72, 106 S.Ct. at 2408 (employer is not always automatically liable for sexual harassment by its supervisors).

failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known. *Hall,* 842 F.2d at 1015; *Hunter v. Allis–Chalmers Corp., Engine Div.,* 797 F.2d 1417 at 1421–22 (7th Cir.1986).

▆▆▆ Under this standard, which extends far enough to reach the conduct in violation of Title VII that occurred in this case, Hacienda can be held liable for Castro's and Nusbaum's actions. As the district found, the general manager of the Hacienda, Frank Godoy, had actual knowledge of allegations of harassment, as did Alicia Castro, a supervisor with authority to hire, discharge, and discipline employees in the housekeeping department. The court also found, by implication, that appellant should have known (or constructively knew), of the harassment because it was severe and pervasive and "seriously tainted" the complainants' working environment. Finally, the district court found that appellant failed to take prompt remedial action when it was notified of its employees' allegations. These findings are not clearly erroneous. The district court did not err in concluding that appellant could be held liable for Castro's and Nusbaum's conduct.

### C

▆▆▆ Appellant's remaining argument, that the complainants failed to pursue internal remedies under appellant's general nondiscrimination policy, can be disposed of quickly. In *Vinson,* the Supreme Court rejected just such an argument, saying that "the mere existence of a grievance procedure and a policy against discrimination, coupled with [an employee's] failure to invoke that procedure," does not necessarily insulate an employer from liability. 477 U.S. at 72, 106 S.Ct. at 2408. Where, as here, the employer's discrimination policy does not specifically proscribe sexual harassment, and its internal procedures require initial resort to a supervisor who is accused of engaging in or condoning the harassment of which the employee complains, it would be plainly unreasonable to require discrimination claimants to exhaust such procedures as a predicate to Title VII suit. In any event, this court has held that a Title VII plaintiff need not exhaust her employer's internal remedies. *Miller,* 600 F.2d at 214.

### VII

Appellant argues that the district court erred in awarding backpay to Teodora Castro, Flora Villalobos, and Maria Elena Gonzalez, all of whom were undocumented alien workers when they were subjected to appellant's discriminatory employment practices. The Hacienda also challenges the district court's calculation of the backpay awards, arguing that the district court used the wrong mathematical formula, failed to take into account periods in which the former Hacienda employees were unavailable for work, and did not reduce the awards for the employees' failure to mitigate their damages.

▆▆▆ Whether the district court properly awarded backpay to undocumented workers, who were discharged in violation of Title VII but were not subjected to deportation proceedings and at all relevant times remained available for employment, is a question of law reviewable de novo by this court. *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The district court's calculation of the backpay award, however, is reviewed only for an abuse of discretion, *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 414, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975). Findings of fact supporting the district court's calculations, including findings that a victim of discrimination did or did not mitigate her damages, are subject to review only for clear error. Fed.R. Civ.P. 52(a); *see also Waters v. City of Atlanta,* 803 F.2d 1135, 1145 (11th Cir. 1986).

### A

▆▆▆ To support its argument that the claimants who were undocumented workers were not entitled to an award of backpay, the appellant relies on an interpretation of a Supreme Court case, *Sure–Tan Inc. v. NLRB,* 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), that has been twice rejected by this court. *See Local 512,*

*Warehouse & Office Workers' Union v. NLRB*, 795 F.2d 705 (9th Cir.1986); *Bevles Co. v. Teamsters Local 986*, 791 F.2d 1391 (9th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 500, 98 L.Ed.2d 499 (1987).

*Sure–Tan* involved undocumented alien workers who had been subjected to an unfair labor practice in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 *et seq.,* when their employer called in the Immigration and Naturalization Service to investigate their immigration status after the union they supported won a representation election. To avoid deportation after arrest by INS officers, the employees voluntarily left the country on the same day the officers visited the employer's work site. Although the Court determined that undocumented aliens are protected by the NLRA, 467 U.S. at 891–94, 104 S.Ct. at 2808–2810, the Court held that the court of appeals exceeded its limited powers of review when it ordered the NLRB to award the employees a minimum of six months backpay without regard to the employees' actual economic loss or legal availability for work. 467 U.S. at 904–05, 104 S.Ct. at 2815.

In *Local 512*, this court stated that "*Sure–Tan* does not address the question whether an undocumented worker who *remains* in the United States, and who has *not* been the subject of any INS deportation proceedings, is barred from receiving backpay to remedy an NLRA violation." 795 F.2d at 717 (emphasis original). Not-

ing that the thrust of Justice O'Connor's opinion in *Sure–Tan* was directed at the "speculative" nature of a six-month minimum backpay award to employees who were out of the country and thus indefinitely unavailable for work, this court in *Local 512* upheld a backpay award to employees who had been subjected to their employer's unfair labor practices and who suffered actual lost wages before they were reinstated with the same employer. 795 F.2d at 717. In enforcing the NLRB's award, the *Local 512 Court* also observed that "*Sure–Tan* barred from backpay only those undocumented workers who were unavailable for work in the backpay period because they were outside the United States without entry papers." 795 F.2d at 722.

The district court in this case assumed that Title VII, including its remedial provisions, 42 U.S.C. § 2000e–5(g), applied to the undocumented aliens who were subjected by appellant to various forms of employment discrimination.[10] It is basically undisputed that all of the employees who were awarded backpay for the Title VII violations in this case were in the United States, were not subjected to INS deportation proceedings, and were available for employment throughout a backpay period that could readily be calculated with certainty. Under our existing case law, then, the district court did not err in concluding that Castro, Villalobos, and Gonzalez were entitled to backpay in this case despite their status as undocumented aliens. *Local 512*, 795 F.2d 705; *Bevles*, 791 F.2d 1391.[11]

**10.** The EEOC persuasively argues by analogy to case law interpreting the NLRA that undocumented aliens fall within the broad category of "individual[s]" protected by Title VII. *See* 42 U.S.C. §§ 2000e(f), 2000e–1, 2000e–2(f), and 2000e–5(g); *Sure–Tan*, 467 U.S. at 891–92, 104 S.Ct. at 2808–09 (because undocumented aliens are not expressly exempted by Congress they plainly come within the broad statutory definition of employees covered by the NLRA); *see also Hyland v. New Haven Radiology Assoc.*, 794 F.2d 793, 796 (2d Cir.1986); *Armbruster v. Quinn*, 711 F.2d 1332, 1336 (6th Cir.1983). The EEOC has so interpreted the definitional section of Title VII. EEOC Compliance Manual (CCH) ¶ 3806 at 3810–11 (1982) ("the term 'any individual' in § 703 of the Act includes any person, whether documented or not, within the jurisdictional boundaries of any 'State'...."). The Commission notes, moreover, that the remedial

provision of Title VII, 42 U.S.C. § 2000e–5(g), was "expressly modeled" on the analogous remedial provision of the NLRA, 29 U.S.C. § 160(c). *Ford Motor Co. v. EEOC*, 458 U.S. 219, 226 n. 8, 102 S.Ct. 3057, 3062 n. 8, 73 L.Ed.2d 721 (1982).

Because appellants do not contest this issue, we will assume without deciding that the undocumented workers in this case were entitled to the protections of Title VII.

**11.** We note, however, that employers who hire undocumented workers are now subject to fines and other penalties. *See* Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, § 101(a)(1), 100 Stat. 3359, 3360 (1986) (amended 1988). Although we need not decide the issue in this case, it may well be that this recent legislation changes the mix of policy considerations underlying the case law which supports

**B**

 We turn now to appellant's arguments that the district court abused its discretion in calculating the backpay awards in this case. At the outset, it is important to note that, in awarding backpay under Title VII, the district court is required to attempt to make victims of discrimination whole by restoring them to the position in which they would have been absent the discrimination. *Albermarle*, 422 U.S. at 420–21, 95 S.Ct. at 2372–73. Title VII also requires mitigation of damages, however, by providing that "amounts earnable with reasonable diligence" be deducted from a backpay award. 42 U.S.C. § 2000e–5(g); *see also Ford Motor Co. v. EEOC*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). The backpay award in this case, based as it was on mitigation and other findings of fact that were not clearly erroneous, was well within the court's discretion.

 Hacienda's argument that the district court used the wrong mathematical formula in computing backpay for its former employees is meritless. The district court essentially adopted figures, calculated by the EEOC, that reflected the union contract's hourly pay rates for a 40–hour work week. Appellant argues that court should have deducted amounts for holidays that were included in the court's calculations. As the collective bargaining agreement to which appellant and its union are parties provides for paid holidays, this argument borders on the absurd. The district court's use of the Commission's formula was not an abuse of discretion.[12]

We also reject Hacienda's argument that the claimants failed to mitigate their damages. The court accounted for evidence that other hotel maid jobs existed in the Los Angeles area by cutting off Gonzalez's backpay award one year after her discharge, implicitly finding that she failed to mitigate as of that time. Evidence that Gonzalez received unemployment benefits during that year further supports the court's implicit finding that she actively sought alternative employment during that period. The court's calculations also clearly reflect that it considered and, where there was supporting evidence, made reductions for the claimants' other sources of income during the backpay periods. The court's refusal to reduce further the awards as appellant urged on the basis of thin or ambiguous evidence—for example, for amounts Castro earned cleaning house for Mercedes Flores—was clearly reasonable and not an abuse of discretion. We see no reason to disturb the backpay awards entered by the district court.

**VIII**

Appellant's final arguments challenge the district court's decision permanently to enjoin appellant from "engaging in any employment practice which discriminates on the basis of sex, religion and opposition to practices made unlawful by Title VII." Appellant contends that the Commission's claim for injunctive relief is moot, and that a permanent injunction was an inappropriate and unneeded sanction because there is no reasonable expectation that the alleged violations will recur.

---

our conclusion that undocumented employees may recover back pay in a Title VII action. *See Local 512*, 795 F.2d at 717–22.

**12.** Hacienda's other arguments about the basic calculation are equally frivolous. The drastically-reduced average monthly hours figure that appellant urges for calculation of Gonzalez' backpay award, for example, is based on discredited summaries prepared by Alicia Castro that reflected a period in which Gonzalez did not work at all because she was hospitalized for and had to recover from surgery. There is no other evidence that Gonzalez was unavailable during the actual backpay period by reason of illness or other disability. It was not unreason-

able to assume that she would have been available for 40 hours of work per week during that period.

Also contrary to Hacienda's assertion, the district court *did* account for Castro's second period of pregnancy disability in its calculation by deducting from her backpay award an average amount of wages for the period from December 1983 through February 1984.

Finally, the court's refusal to deduct amounts from Castro's award for speculative and unproven work-related expenses such as child-care and transportation was not an abuse of discretion. *See United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918 (10th Cir.1979).

 We review de novo a determination of mootness. *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1542 (9th Cir.1987). The district court's decision to award or deny injunctive relief, however, is reviewed for an abuse of discretion and the application of correct legal principles. *Id.* at 1544; *see also SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 465 (9th Cir.1985). A claim is moot if the issues are no longer live or the parties lack a legally cognizable interest in the outcome. *EEOC v. Goodyear Aerospace*, 813 F.2d at 1542.

Even if the individual complainants have been made whole by the relief awarded by the district court, this court has recognized that the EEOC has a right of action that is independent of the employees' private rights of action. *Id.* This is because the EEOC is not merely a proxy for the victims of discrimination, but acts also "to vindicate the public interest in preventing employment discrimination." *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 326, 100 S.Ct. 1698, 1704, 64 L.Ed.2d 319 (1980). By seeking injunctive relief, the EEOC not only deters future unlawful discrimination but also seeks to protect aggrieved employees and others similarly situated from the fear of retaliation for filing Title VII charges. By seeking injunctive relief, moreover, the EEOC "promotes *public* policy and seeks to vindicate rights belonging to the United States as a sovereign." *EEOC v. Occidental Life Ins. Co. of Cal.*, 535 F.2d 533, 537 (9th Cir.1976), *aff'd* 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977).

This court recently held that victims of employment discrimination generally are entitled to an injunction against future discrimination, unless the employer proves it is unlikely to repeat the practice. *EEOC v. Goodyear Aerospace*, 813 F.2d at 1544. It was not an abuse of discretion to conclude on the facts of this case that appellant has not carried its burden of proof.

Appellant's argument that an injunction is unnecessary runs counter to the district court's findings. The district court concluded that appellant's multiple violations of Title VII "require[d] that a permanent injunction issue." The district court also found that appellant did not take prompt remedial action upon notification of the sexual harassment allegations against it. As this court recently observed:

> "An employer that takes curative actions only after it has been sued fails to provide sufficient assurances that it will not repeat the violation to justify denying an injunction."

*EEOC v. Goodyear Aerospace*, 813 F.2d at 1544. Appellant's recent efforts to train managerial employees regarding discrimination problems and the absence of further EEOC charges in recent times are encouraging and laudable; however, the district court did not abuse its discretion by awarding permanent injunctive relief on the facts of this case.

For all of the foregoing reasons, the judgment of the district court is AFFIRMED.