973 F.2d 773
 59 Fair Empl.Prac.Cas. (BNA) 929,
59 Empl. Prac. Dec. P 41,761
Joyce INTLEKOFER, Plaintiff-Appellant,
v.
Thomas TURNAGE, Administrator and Veterans Administration, A
Federal Agency, Defendants-Appellees.
 No. 90-16793.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 12, 1992.
Decided Aug. 24, 1992.
 
 Stephine M. Wells, Sausalito, Cal., for plaintiff-appellant.
 Shirley Smith, Asst. U.S. Atty., Reno, Nev., for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before: HALL and WIGGINS, Circuit Judges, and KEEP,* Chief District Judge.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 Plaintiff Joyce Intlekofer appeals the district court's judgment in favor of her employer, the Veterans Administration ("VA"), in this Title VII action. She challenges the district court's finding that the VA took reasonable and appropriate steps to end the sexual harassment by her co-worker.
 
 
 2
 The district court had jurisdiction under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343. We have jurisdiction over this timely appeal pursuant to 42 U.S.C. § 2000e-5(j) and 28 U.S.C. § 1291, and we reverse.
 
 
 3
 * In May, 1988, Joyce Intlekofer initiated this Title VII action against the VA alleging sexual harassment, sexual discrimination, and retaliation.[1] She complained that the VA was liable for the sexual harassment by her co-worker, Norman Cortez, because the VA had actual knowledge of the harassment, yet failed to take immediate and appropriate action to remedy it. After a bench trial, the district court found that Norman Cortez's behavior, although not overtly sexual, constituted sexual harassment. Nevertheless, it found that the VA could not be held liable under Title VII because the VA "acted promptly and reasonably in responding to plaintiff's Reports of Contact."[2] Intlekofer appeals only the latter ruling.
 
 
 4
 Intlekofer and Cortez were co-workers in the Medical Administration Services division of the VA Medical Center. The district court found that Intlekofer and Cortez were involved in a personal, intimate relationship prior to 1987. In 1987, however, Intlekofer began to file Reports of Contact complaining about Cortez's behavior toward her. From April 1987 to July 1988 Intlekofer filed approximately sixteen Reports of Contact. Although the majority of Reports concern Cortez, only eight involve specific incidents between Intlekofer and Cortez. The other Reports of Contact discuss either allegations about Cortez's behavior reported to Intlekofer by other co-workers, or actions taken by Intlekofer in response to Cortez's actions.
 
 
 5
 The VA first became aware of the problem between Intlekofer and Cortez in April of 1987, when Intlekofer filed her first Report of Contact with her supervisor, Pat Kehoe. That report alleged harassment in the form of "touching, highly personal and private suggestions and constant pressure to enter into a totally unwanted relationship." Kehoe met with Intlekofer to discuss the report, but Intlekofer apparently declined to give a more detailed description of Cortez's behavior. During a subsequent meeting with Cortez, Kehoe informed him that the behavior Intlekofer had described was inappropriate and must stop immediately. Kehoe also told Cortez that "if there should be additional complaints in the future, a more severe disciplinary measure would be required."
 
 
 6
 The second Report of Contact stated that Cortez telephoned Intlekofer at her home, asked her personal questions and requested her permission to go to her house after his shift ended. Intlekofer followed Kehoe's advice and quickly "conclud[ed] the unwanted conversation." A five-month interval separated this occurrence and the next Report, which was filed on November 4, 1987. It documented an incident in which Cortez screamed at Intlekofer in front of staff and patients, claiming that Intlekofer gave him a poor shift schedule and threatening that he would call in sick.
 
 
 7
 Despite a subsequent warning by VA management to stop interacting with Intlekofer, Cortez continued his behavior. The fourth Report of Contact, filed November 29, 1987, revealed that Cortez monitored Intlekofer's telephone calls, informing some callers that Intlekofer was busy and then hanging up. The Report also described verbal quarrels between the two, and stated that Intlekofer felt Cortez's behavior was harassment. Johanna Skinner, a fellow employee, corroborated this Report.
 
 
 8
 Intlekofer filed her fifth Report on December 10, 1987. It disclosed that one night Cortez "chased [her] out of the hospital" stating "I'll get you for this. I owe you one." Intlekofer indicated that such behavior made her fear for her life. A witness filed a Report on December 9, 1987, corroborating Intlekofer's Report. Kehoe met with Cortez to discuss the incident, but decided not to discipline him or issue a warning because Cortez said he had only asked Intlekofer why she was leaving in the middle of her shift.
 
 
 9
 The sixth Report concerned the December 18, 1987, meeting between Intlekofer and Michael Brown, Chief of Medical Administration Services, in which Brown discussed Intlekofer's complaints and allegedly accused her of leading Cortez on. The seventh Report repeated a conversation between Cortez and an unknown employee in which Cortez told the employee that Intlekofer was dumb. Intlekofer filed the eighth Report on January 5, 1988,[3] alleging that at the end of her late night shift, Cortez threatened to "run outside the VA to see which way I would go home. He told me that if I didn't go towards my home, he knew I must be going to meet someone." The day after these threats, Cortez yelled at her.
 
 
 10
 Intlekofer filed the ninth and tenth Reports of Contact within two days of one another--on January 14 and 16, 1988. Neither Report concerned direct confrontations between Intlekofer and Cortez. In one, Intlekofer alleged that Cortez continued to talk about her to other employees. The other concluded that Cortez ruined her reputation because three co-workers had recently taken a sudden interest in her and had individually asked her out on dates.
 
 
 11
 Intlekofer filed an informal complaint with the Equal Employment Opportunity Commission ("E.E.O.C.") in early December, 1987. Brown and Kehoe met with Cortez on January 26, 1988, to inform him "that he must change his behavior toward Joyce Intlekofer and that any future valid complaints filed by Ms. Intlekofer ... could lead to disciplinary action." After two months of investigation, Donna Reese, the E.E.O.C. counselor for the VA, issued a report concluding that Cortez was sexually harassing Intlekofer. The report made four proposals for remedying the harassment: (1) Cortez should receive professional counseling; (2) Cortez and Intlekofer should not work the same shifts; (3) Cortez must stop discussing Intlekofer with other employees; and (4) Cortez and Intlekofer should limit their contact at work to VA business. Although the VA disagreed with the report and did not believe that Cortez's actions constituted sexual harassment, it adopted the last three courses of action. Specifically, the VA adjusted both Intlekofer and Cortez's shifts in order to reduce contact at work, and repeatedly warned both employees not to be in the Medical Center at any time other than during their respective shifts. The VA also forbade Cortez from speaking with other employees about Intlekofer, and told both employees to limit their contact at work to business matters. It declined to adopt the first recommendation, citing its lack of authority to order Cortez to seek outside help in the form of professional psychological counseling.
 
 
 12
 After the VA instituted the three measures, Intlekofer filed six Reports of Contact in the next six months. Only three Reports concerned incidents between Cortez and Intlekofer, and none alleged that Cortez continued to discuss Intlekofer with other employees. The February 15, 1988, Report stated that Cortez "throws keys at me, gives me looks that could kill, and does not give any report as to what is happening at the hospital." On June 1, 1988, Intlekofer filed a Report stating that Cortez made an obscene gesture at her in the employee parking lot. Finally, one of the three Reports filed July 7, 1988, claimed that a co-worker saw Cortez draw an obscene picture on Intlekofer's locker.[4]
 
 
 13
 While the VA investigated Intlekofer's complaints and held continuous counseling sessions with Cortez in which he received both oral warnings to refrain from talking to or about Intlekofer, and threats that he would be disciplined if he continued his behavior, the VA did not take more severe disciplinary steps against Cortez, such as issuing a formal warning letter or imposing probation or suspension. Moreover, it is unclear whether the VA met with Cortez after each Report of Contact or sporadically. Kehoe estimated that she had approximately ten meetings with Cortez in response to Intlekofer's Reports of Contact, and that she spent a total of two weeks working time attempting to solve the conflict. Although Brown estimated that he spent approximately one hundred hours trying to remedy the problem, he did not discipline Cortez in any manner other than meeting with him and requesting that he stop the harassment and that he stay away from Intlekofer.
 
 
 14
 Maryann Coffey, the Director of the VA Medical Center, met with Intlekofer at least four times starting in December of 1987. Each meeting took approximately one to two hours. Coffey attempted to change Cortez's and Intlekofer's shifts in an effort to separate the two, but did not meet with Cortez personally or discipline him in any other manner. Jacqueline Freeman, the Personnel Management Specialist, met with Kehoe and Brown to discuss possible scheduling changes. She also looked for other positions for both Intlekofer and Cortez, but could not find a suitable position for either employee.
 
 
 15
 Brown, Coffey and Kehoe met several times after Reese submitted her report in order to prepare a settlement agreement. Each of the three proposed settlement agreements offered to continue implementing Reese's recommendations in exchange for Intlekofer withdrawing her formal complaint with the E.E.O.C.[5] Intlekofer refused each proposal.
 
 II
 
 16
 We review the district court's findings of fact for clear error. Jordan v. Clark, 847 F.2d 1368, 1375 (9th Cir.1988), cert. denied, 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989). The district court's conclusion that the VA took immediate and appropriate remedial action, however, is reviewed de novo because it "requires us to consider legal concepts in the mix of fact and law." United States v. McConney, 728 F.2d 1195, 1202 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); see also Jordan, 847 F.2d at 1375 n. 7 (whether employee's conduct creates hostile environment under Title VII reviewed de novo).
 
 III
 
 17
 After the district court's decision in this case, this Circuit enunciated the standards by which an employer's actions should be measured when deciding whether the employer is liable for sexual harassment by an employee. See Ellison v. Brady, 924 F.2d 872 (9th Cir.1991). Thus, before evaluating the appropriateness of the VA's conduct, we must decide whether the standard announced in Ellison applies retroactively to the present case. Retroactivity depends on an analysis of three factors: (1) whether Ellison announced a new rule of law; (2) whether retroactive application of the Ellison rule "will further or retard its operation;" and (3) whether retroactive application would produce inequitable results. See Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07, 92 S.Ct. 349, 355-56, 30 L.Ed.2d 296 (1971).
 
 
 18
 According to Chevron Oil, a case establishes a new rule "either by overruling clear past precedent on which litigants may have relied ..., or by deciding an issue of first impression whose resolution was not clearly foreshadowed." Id. We do not believe that Ellison created a new rule of law. In Ellison, this court held that the employer's remedial action "should be 'reasonably calculated to end the harassment.' " Id. at 882, quoting Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983). Essentially, "[e]mployers should impose sufficient penalties to assure a workplace free from sexual harassment." Ellison, 924 F.2d at 882. If an employer knows or should have known of the harassment, it must take some form of disciplinary action. Id. (failure to "take even the mildest form of disciplinary action" renders the remedy insufficient under Title VII). The precise nature of the disciplinary action is up to the employer, provided that it is "assessed proportionately to the seriousness of the offense." Id.
 
 
 19
 The VA argues that insofar as Ellison creates a duty to take at least the mildest form of disciplinary action, instead of merely requesting that the behavior stop, the case is a departure from current precedent in that it takes "discretion away from the employer to decide what is appropriate in the circumstances." We disagree. Not only does Ellison's holding leave considerable discretion to the employer, it was clearly foreshadowed by this court's decision in E.E.O.C. v. Hacienda Hotel, 881 F.2d 1504 (9th Cir.1989). In that case, we held that an employer is liable if it fails to remedy the harassment. Hacienda Hotel, 881 F.2d at 1515-16. A logical reading of this language encompasses the idea that the employer must take some form of disciplinary action against the harassing co-worker in order to assure a workplace free of sexual harassment.
 
 
 20
 Moreover, the regulation enforcing Title VII states that "an employer is responsible for acts of sexual harassment in the workplace where the employer ... knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." 29 C.F.R. § 1604.11(d) (emphasis added). We interpret the phrase "appropriate corrective action" to require some form, however mild, of disciplinary measures. Action is "corrective" only if it contributes to the elimination of the problem at hand. Because disciplinary measures are more likely to decrease the likelihood of repeated harassment than a mere request to stop the behavior, disciplinary measures are "corrective" within the meaning of the regulation.
 
 
 21
 Finally, Ellison directly adopted the Fourth Circuit's test announced in Katz, 709 F.2d at 256 (remedy must be "reasonably calculated to end the harassment"). While the Katz test does not explicitly require disciplinary measures, application of the test indicates that at least some form of discipline is necessary to satisfy the requirements of Title VII. In Swentek v. USAIR, Inc., 830 F.2d 552 (4th Cir.1987), the Fourth Circuit held that the employer properly remedied the sexual harassment by investigating the allegations, giving written warnings to refrain from harassing behavior, and warning that subsequent behavior would result in suspension. Id. at 558; see also Barrett v. Omaha Nat. Bank, 726 F.2d 424, 427 (8th Cir.1984) (adopting Katz test and holding employer not liable when it investigated allegations and warned employee that further misconduct would result in termination). The court found it significant that no further complaints were lodged by the complainant after the employer's actions. Swentek, 830 F.2d at 558. This emphasis on ending the harassment through remedial measures reveals that the employer's actions must be of a disciplinary nature.
 
 
 22
 We hold that employers have long been on notice, under the EEOC Compliance Guidelines, Hacienda Hotel, and case law of the Fourth and Eighth Circuits, that they are required under Title VII to intervene promptly and effectively to put an end to workplace sexual harassment.
 
 
 23
 The second inquiry requires us to decide whether retroactive application will further or frustrate the purpose of the rule announced in Ellison. Chevron Oil, 404 U.S. at 106-07, 92 S.Ct. at 355-56. The purpose of the Ellison rule is maintenance of an environment free from sexual harassment. Ellison, 924 F.2d at 882. To achieve this goal, the remedies must focus not only on changing the harasser's behavior, but also on "persuad[ing] potential harassers to refrain from unlawful conduct." Id. Obviously, retroactive application of Ellison will not improve Intlekofer's working environment since she has resigned from her position. Nevertheless, measuring the VA's conduct by the Ellison standard will further its purpose because the next time the VA is confronted with sexual harassment allegations, it will be encouraged to impose more severe disciplinary action against the transgressor once an initial counseling session fails to cure the harassment. This will decrease the likelihood of future prolonged sexual harassment by fellow employees. See Ellison, 924 F.2d at 882 (discussing importance of deterrent effect of disciplinary measures).
 
 
 24
 The third inquiry demands that we examine whether retroactivity would result in an inequity to the VA. Chevron, 404 U.S. at 106-07, 92 S.Ct. at 355-56. Prior to Ellison the VA clearly had a duty to take action to remedy the harassment. See Hacienda Hotel, 881 F.2d at 1515-16. While the VA attempted counseling and separation of shifts, the harassment continued. Thus, the VA's actions cannot be said to have been reasonably calculated to end the harassment. Because the VA would be liable under existing precedent, there is no inequity in applying Ellison's rule to the VA's actions.
 
 IV
 
 25
 Turning to the central issue, we must now decide whether the VA's actions comported with the standard set out in Ellison. The district court found that the VA "acted promptly and reasonably in responding to plaintiff's Reports of Contact." In so ruling, the court relied on the fact that Kehoe thoroughly investigated the first complaint and met with Cortez in order to avoid further hostility. It also found that the VA made several attempts to separate Intlekofer and Cortez so that they did not work the same shift or run into one another at the change of shifts. Finally, the trial judge deemed it significant that "both parties were counselled to avoid each other except as necessary for work at the Veterans Administration."
 
 
 26
 The VA argues that its duty to take remedial action did not arise until Reese submitted her report concluding that Cortez was sexually harassing Intlekofer. It was not until this point, the VA contends, that it knew Cortez's conduct was unlawful. This line of argument, which appears frequently throughout the VA's brief, is foreclosed since neither party appealed the district court's finding that Cortez engaged in sexual harassment from April 1987 until July 1988[6], and that the VA was aware of Cortez's conduct. Because we are constrained by the district court's sexual harassment determination, the only issue confronting us is whether the VA took prompt and appropriate remedial action designed to end the sexual harassment by Norman Cortez.[7]
 
 
 27
 We find that the VA did not meet the standard set out in Ellison because it did not respond in a manner likely to put a stop to Cortez's unlawful behavior. Specifically, the VA failed to take more severe disciplinary measures against Cortez once it learned that his harassing behavior had not stopped. Ellison held not only that the remedies must be "reasonably calculated to end the harassment," but that the remedies must be of a disciplinary nature. Ellison, 924 F.2d at 882 ("Employers send the wrong message to potential harassers when they do not discipline employees for sexual harassment."). If the employer "fail[s] to take even the mildest form of disciplinary action" the remedy is insufficient under Title VII. Id. Of course, I acknowledge that "discipline" can take many forms, and I do not attempt to confine the employer to options specifically mentioned in this opinion. The important point is that the appropriateness of the remedy depends on the seriousness of the offense, the employer's ability to stop the harassment, the likelihood that the remedy will end the harassment, and "the remedy's ability to persuade potential harassers to refrain from unlawful conduct." Id.
 
 
 28
 Intlekofer argues that counseling can never be considered "disciplinary," and that therefore the VA failed to satisfy its duty under Ellison. Although Ellison stated that "Title VII requires more than a mere request to refrain from the discriminatory conduct," counseling sessions are not necessarily insufficient. Id. Indeed, an oral rebuke may be very effective in stopping the unlawful conduct. At the first sign of sexual harassment, an oral warning in the context of a counseling session may be an appropriate disciplinary measure if the employer expresses strong disapproval, demands that the unwelcome conduct cease, and threatens more severe disciplinary action in the event that the conduct does not cease. I approve of this remedy in a case such as this where the harassing conduct is not extremely serious and the employer cannot elicit a detailed description concerning the occurrence from the victim. I stress, however, that counseling is sufficient only as a first resort. If the harassment continues, limiting discipline to further counseling is inappropriate. Instead, the employer must impose more severe measures in order to ensure that the behavior terminates. Again, the extent of the discipline depends on the seriousness of the conduct. Ellison, 924 F.2d at 882.[8]
 
 
 29
 Here, Kehoe's initial counseling and warning that Cortez would be subject to future disciplinary actions would have been sufficient had Cortez not continued to harass Intlekofer. Since Cortez did not discontinue the unwanted contact, the VA was required by Title VII and the implementing regulations to carry through with its threat to discipline him more severely. Though the VA attempted an informal separation of Cortez's and Intlekofer's shifts shortly after the first Report of Contact, this measure obviously was unsuccessful.[9]
 
 
 30
 Certainly after Intlekofer filed the third, fourth and fifth Reports of Contact (all within a thirty-day span), the VA should have done more than counsel Cortez and continue the informal separation. All three reports reveal that Cortez continued to harass Intlekofer, yet there is no evidence that Cortez was reprimanded, issued a written warning, or disciplined in any other manner. At this point, the degree of the harassment had escalated, not because Cortez's behavior was overtly sexual in nature or grew increasingly worse, but because Cortez showed no intention to heed the VA's warnings and restrain himself. The VA therefore had a duty to institute more severe disciplinary measures commensurate with the duration of the harassment.
 
 
 31
 Failure to impose more harsh disciplinary measures rendered the VA's initial warning an empty threat. The VA's counseling sessions and informal attempts at separation did nothing except assure Cortez that continued harassment would be tolerated. In this context, the VA's behavior was not "reasonably calculated to remedy the harassment."
 
 
 32
 The VA argues that the sexual harassment ended after it adopted the recommendations in Reese's report. This is not correct. Although the VA received no more reports of Cortez discussing Intlekofer with other employees, it did receive two reports of direct contact between Cortez and Intlekofer. In one, Cortez allegedly threw his keys at Intlekofer and gave her threatening looks. In the other, Cortez made an obscene gesture toward Intlekofer in the employee parking lot. A third Report revealed that Cortez was seen drawing an obscene picture on Intlekofer's locker. As these occurrences indicate, Cortez did not discontinue his behavior after the VA implemented Reese's recommendations.
 
 V
 
 33
 We hold that the VA's response to Intlekofer's repeated complaints was insufficient under Title VII. Although the VA did not sit idly by while Intlekofer continued to file Reports of Contact about Cortez's conduct, it did fail to take measures that were reasonably calculated to end the harassment. The VA continued to counsel Cortez and to attempt an informal separation when it was apparent that these disciplinary measures were ineffective in terminating Cortez's behavior. Even after the VA instituted formal separation and continued to warn Cortez that further harassment would result in disciplinary action, Cortez's behavior did not subside. More severe disciplinary action was necessary.
 
 
 34
 We therefore REVERSE the judgment of the district court and REMAND for a calculation of damages, attorney's fees and costs.[10]
 
 
 35
 KEEP, Chief District Judge, concurring in judgment.
 
 
 36
 I concur in the result reached by Judge Hall, that the means undertaken by the Veterans Administration in this case were insufficient to remedy the incidents of sexual harassment found by the trial court. Unlike Judge Wiggins, I do not believe that the question of whether Mr. Cortez's behavior constituted a prima facie case of sexual harassment is properly before the court, as this issue was not raised by the Veteran's Administration on appeal. However, I write separately to address what I perceive to be an inherent ambiguity in Judge Hall's discussion of discipline, and to emphasize what I believe to be Title VII's remedial, rather than punitive goals.
 
 
 37
 Like Judge Wiggins, I find problematic Judge Hall's conclusions that "at least some form of discipline is necessary to satisfy the requirements of Title VII." The word "discipline," which Judge Hall does not define, has both a punitive and corrective aspect.[1] It is unclear from the text of her opinion to which meaning Judge Hall's repeated uses of "discipline" refer: she distinguishes in Section III actions that are "disciplinary" from those that are merely "corrective;" however, she subsequently cites in support of her discussion of retroactivity cases from other circuits in which an employee warning was held sufficient to discharge an employer's duty under Title VII. See Swentek v. USAIR, Inc., 830 F.2d 552 (4th Cir.1987); Barrett v. Omaha Nat. Bank, 726 F.2d 424, 427 (8th Cir.1984). It is therefore unclear whether Judge Hall's opinion would require employers to punish employees for incidents of harassment in the first instance. To the extent that Judge Hall's opinion does create an absolute rule that a harasser must be punished if the dictates of Title VII are to be followed, I believe that it goes significantly beyond the dictates of Ellison v. Brady, 924 F.2d 872 (9th Cir.1991), and is inconsistent with the language and purpose of Title VII.[2]
 
 
 38
 The Supreme Court has emphasized that Title VII is a "remedial" statute, designed to eliminate the effects of unlawful discrimination in the workplace. See Local 93, International Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986); Transworld Airlines v. Thurston, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); Firefighters Local Union v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). Precisely because a court may impose on an employer only such measures that will remedy discrimination and make a victim whole, courts have been willing to impose liability even in the absence of willfulness or "intentional" violation of an employee's rights. Id.
 
 
 39
 Ellison crafted an approach to sexual harassment that I find consistent with this emphasis on remedy. Ellison noted that EEOC standards explain that an employer's action is appropriate where it "fully remedies the conduct without adversely affecting the terms or conditions of the charging party's employment in some manner (for example, by requiring the charging party to work ... in a less desirable location)." Id. at 881, quoting EEOC Compliance Manual (CCH) § 615.4(a)(9)(iii), p 3103, at 3213 (1988). This court concluded, drawing from this standard and those of other circuit courts, that remedies should be "reasonably calculated to end the harassment" and should be "assessed proportionately to the seriousness of the offense." Ultimately, this court explained in Ellison,
 
 
 40
 the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in the harassment. In evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers to refrain from unlawful conduct. Indeed, meting out punishments that do not take into account the need to maintain a harassment-free working environment may subject the employer to suit by the EEOC.
 
 
 41
 Ellison, 924 F.2d at 882.
 
 
 42
 Other circuits have articulated a similar emphasis on remedy in explaining the duty of employers to end harassment by employees. A recent case in the Fifth Circuit defined this duty in the following language:
 
 
 43
 [W]e are guided by Bundy v. Jackson, 641 F.2d 934, 947 (D.C.Cir.1981), where the court held that '[an employer] should promptly take all necessary steps to investigate and correct any harassment, including warnings and appropriate discipline directed at the offending party, and should generally develop other means of preventing harassment within the agency.' Consistent with Bundy, we have held that an employer must take prompt and appropriate remedial action, 'reasonably calculated' to end the harassment. What is appropriate remedial action will necessarily depend on the particular facts of the case--the severity and persistence of the harassment, and the effectiveness of any initial remedial steps. (cites) These cases indicate that not every response by an employer will be sufficient to discharge its legal duty. Rather, the employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not "reasonably calculated" to halt the harassment.
 
 
 44
 Waltman v. Int'l Paper Co., 875 F.2d 468, 479 (5th Cir.1989) (emphasis added).
 
 
 45
 While I agree with Judge Hall that discipline and/or punishment may be appropriate under the particular facts of a case, I am uncomfortable with a holding that requires discipline and punishment regardless of the circumstances of the offense or the expected effect on the offender's behavior. I read Title VII and the regulations and cases decided thereunder to require appropriate corrective action--no more, no less. Even a harshly punitive response by an employer may be insufficient if it is not "reasonably calculated to end the harassment," see Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983); conversely, a "mere request to stop" unlawful conduct may be sufficient to alter the unlawful behavior of some harassers, and therefore sufficient to discharge the employer's duty under Title VII. Although I agree with much of Judge Hall's analysis, I cannot agree, as she suggests, that disciplinary measures are always more likely to decrease the repeated harassment than are other forms of corrective action. I therefore cannot join in a holding that necessarily requires a disciplinary response to incidents of sexual harassment.
 
 
 46
 I suggest that a more fruitful line of analysis, which I believe Judge Hall does adopt at some points in her opinion, would focus on an employer's obligation to respond to harassment in the manner most likely to put a stop to the unlawful behavior. This response will, I believe, frequently require a disciplinary or punitive component, and may require immediate termination in the most egregious cases. It also requires, as I believe Judge Hall suggests, that the response by an employer increase in severity if initial attempts do not eliminate the abuse. Finally, I join Judge Hall in emphasizing that a single, isolated response, whether in the form of a rebuke, counseling or demotion, is insufficient to immunize an employer from liability if the response does not put an end to the abusive behavior. The benchmark of an adequate employer response, however, must be its effectiveness in preventing and eliminating sexual harassment in the workplace; any other standard, I believe, does not comport with the Congressional mandate expressed in Title VII.
 
 
 47
 While the difference between my interpretation of the corrective burden placed on employers by Title VII and that expressed by Judge Hall ultimately may be merely semantic, I find her repeated references to "discipline" extremely ambiguous, suggesting a punitive standard inappropriate in this context. My attempt is not to soften the effects of Judge Hall's opinion, but rather to underscore the corrective goal that must focus any Title VII remedy. I would therefore clearly hold that the appropriateness of an employer's response to harassment by an employee will be assessed in light of the seriousness of the behavior and the effectiveness of previously-tried approaches, rather than against an absolute requirement of discipline.
 
 
 48
 For the reasons expressed, I respectfully concur in the judgment.
 
 
 49
 WIGGINS, Circuit Judge, dissenting.
 
 
 50
 I respectfully dissent. I do not believe that the behavior of Mr. Cortez constituted a prima facie case of sexual harassment of Ms. Intlekofer. While this court may be required to find that there was in fact sexual harassment because the VA failed to appeal that finding, I nevertheless believe that an employer has no duty to remedy nonexistent harassment. Thus, I disagree with the majority's conclusion that the VA took insufficient steps to stop Cortez's behavior.
 
 I.
 
 51
 Title VII of the Civil Rights Act prohibits employers from discriminating "with respect to ... compensation, terms, conditions, or privileges of employment because of ... sex...." In what some may regard as a major advance in social justice, the administrator of the Equal Employment Opportunity Commission has taken the addition of a single word, "sex", to Title VII and has created a new substantial risk of liability to employers.
 
 
 52
 In implementing regulations, the EEOC has defined sexual harassment in 29 C.F.R. section 1604.11 as follows:Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.
 
 
 53
 We deal here with conduct that fits, if at all, under subdivision (3), a so-called "hostile environment" case. Each subdivision, however, requires a preliminary showing by the claimant. Basic to a finding of illegal sexual harassment by an employer is that the complained of conduct must be "unwelcome"--i.e., nonconsensual--must constitute a sexual advance, request a sexual favor, or constitute verbal or physical conduct of a sexual nature. Jordan v. Clark, 847 F.2d 1368, 1373 (9th Cir.1988), cert. denied, sub. nom., Jordan v. Hodel, 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989). This circuit has not declared that simple hostility between coworkers of the opposite sex, without sexual overtones, may state a cause of action against the employer under Title VII. Ellison v. Brady, 924 F.2d 872, 875 n. 5. ("We need not and do not decide whether a party can state a cause of action for a sexually discriminatory work environment under Title VII when the conduct in question is not sexual.") And I am not prepared to do so here.
 
 
 54
 The district court found that Intlekofer and Cortez were involved in a consensual sexual relationship for two years, apparently from 1985 until 1987. When they broke up, there was a great deal of ill feeling on both sides. Intlekofer simply chose to air her grievances against Cortez to her employer. It is not an employer's responsibility to mediate relationship disputes between employees unless and until there is actual sexual harassment. In this case, it is clear that Cortez's relationship with Intlekofer after their consensual affair ended did not fit into any of the three definitions of sexual harassment.
 
 
 55
 Intlekofer testified that Cortez, for no reason apparent to her, became possessive of her in 1987, apparently after their sexual relationship ended. She testified that he would try to touch her when they were alone at work. I find this to be the only complaint of arguably "sexual harassment." Given the previous sexual relationship between the parties and Intelkofer's failure to complain when the attempted touching occurred, I discredit this complaint as a basis for her cause of action. She first complained to her supervisor because Cortez allegedly told her that he was watching to see which direction she took to go home. She next complained because Cortez allegedly told coworkers that Intlekofer had sex with him. She said Cortez made it impossible to work because he did not give her phone messages and would sometimes pace the room as she interviewed patients. She also complained that she feared Cortez because he said he would get even with her. Intlekofer further complained that Cortez told jokes about her to fellow employees--some of which she believed were sexually explicit. On her third complaint, Intlekofer complained that Cortez called her at home. However, she admitted that many of the calls she attributed to Cortez were never identified. Furthermore, there is no evidence they were of a sexual nature.
 
 
 56
 Intlekofer also complained that Cortez would throw office keys and the beeper on the desk or the floor rather than hand them to her, as he was required to do at the end of a shift. Likewise, Intlekofer complained that Cortez would yell at her because she talked to her boyfriend. She also testified that on at least one occasion Cortez asked if he could go over to her house. She said he complained to her about the fact that he had been assigned to work midnight shifts seven days a week in late 1987. According to Intlekofer, Cortez threatened to call in sick for his shifts so that she would have to work double shifts. He also allegedly followed her out of the hospital one night in December 1987 when she left work early because she was not feeling well, asking her where she was going and yelling "I'll get you for this. I owe you one." Intlekofer also offers as proof of the sexual harassment the fact that three men asked her for dates entirely unexpectedly. She speculated that this showed Cortez had ruined her reputation, making these men want to date her. She also complained that Cortez once parked next to her in the lot, out of his way, slammed his car door and made an obscene gesture toward her. She also testified that she believed Cortez defaced a sticker on her locker with an obscene drawing, but a fellow employee scraped it off.
 
 
 57
 The district court, however, did not find Intlekofer entirely credible, as evidenced by the fact that the judge did not believe her denials of any sort of personal relationship with Cortez. Other VA employees testified that it was common knowledge that Cortez and Intlekofer had an intimate relationship. Cortez testified that he broke up with Intlekofer because she was dating several other people at the same time and lying to him about it. At the time they broke up, Intlekofer was in charge of scheduling and Cortez testified that she made a concerted effort to give him the most undesirable shifts--nights, weekends and double shifts. Furthermore, Intlekofer allegedly threatened Cortez at the time of their breakup by warning him that he would never be able to ignore her. After they broke up, Intlekofer filed multiple complaints of harassment against him.
 
 
 58
 It may be argued that some of Cortez's alleged conduct was of a sexual nature, and was offensive. However, viewed in the context of their prior relationship and of the behavior Intlekofer apparently directed toward Cortez, Cortez's conduct does not constitute sexual harassment. Instead, there is significant evidence that Intlekofer and Cortez disliked each other and each was therefore hostile toward the other.
 
 
 59
 The VA, for its part, did what could reasonably be expected to defuse a difficult situation. After the first two complaints, the VA counseled both Cortez and Intlekofer, suggesting they avoid each other and asking Cortez not to talk to Intlekofer. After the complaints persisted, the VA demoted Cortez to the file room and separated their schedules so they would not work together. Although their schedules still overlapped for a few minutes, this was unavoidable under the circumstances. Even Intlekofer testified to the fact that given the number of shifts a week and the number of MAAs, it would be impossible for the VA to work out a schedule where Intlekofer and Cortez never saw each other. Under the circumstances, the VA made a reasonable effort to separate two feuding employees. Even if Cortez's behavior constituted sexual harassment, which I do not believe, the VA needed only do what was reasonably calculated to end the harassment. I believe the VA did so.
 
 
 60
 I do not, of course, maintain that sexual harassment can never occur after a failed relationship between employees. Rather, I believe that the relationship is a factor to be considered both in determining if there was in fact sexual harassment and in determining what should properly be done by an employer to remedy the situation. In this case, I do not believe there was sexual harassment. Because there was not, the VA's actions were entirely appropriate.
 
 II.
 
 61
 I agree with the majority that Ellison would apply retroactively to this case, were I to believe that there was a need to apply it. I write to point out what I believe is incorrect dicta in the majority's opinion. Ellison does not always require punitive disciplinary conduct when an employer receives notice of alleged sexual harassment.[1]
 
 
 62
 It is true that the Ellison court stated that "Title VII requires more than a mere request to refrain from discriminatory conduct." However, this statement was made in the context of a specific set of facts involving an egregious and obvious case of sexual harassment. After examining the surrounding language and the logic of the decision, I cannot believe the Ellison court meant to create a rule always requiring punitive disciplinary action as the first response.
 
 
 63
 "Employers should impose sufficient penalties to assure a workplace free from sexual harassment.... [W]e think that the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in the harassment." Ellison, 924 F.2d at 882. By this language, this court clearly recognized that cases of sexual harassment vary greatly, and the action necessary to stop the behavior also must vary. In some cases, I believe that a request to stop may be sufficient as an employer's first course of action. Without this as an option, we put employers in an impossible position.
 
 
 64
 If we were always to require punitive discriminatory measures, we would create strict liability for employers who fail to define sexual harassment correctly and immediately. First, the parameters of sexual harassment are not clear, and are constantly evolving. To expect an employer always to be able to identify conduct correctly and immediately as sexual harassment is unreasonable. Employers would be forced to punish all accused harassers, regardless of whether they are guilty. This is, of course, unfair to the alleged harasser who is not actually guilty. It is also unfair to the employer, who in trying to protect himself from suit by the alleged victim opens himself up to suit from the unfairly punished alleged harasser. Furthermore, in some cases, it is bad policy to require punitive disciplinary action immediately when a simple request to stop the behavior may be sufficient.[2] Because the definition of sexual harassment is constantly evolving, the alleged harasser, like the employer, may not always know immediately that his conduct constitutes sexual harassment.
 
 
 65
 I respectfully dissent.
 
 
 
 *
 The Honorable Judith N. Keep, Chief Judge of the United States District Court for the Southern District of California, sitting by designation
 
 
 [1]
 The district court's opinion addressed only the sexual harassment claim. Since Intlekofer did not argue this omission as an issue on appeal, we will not consider it. Instead, we address the only issue properly raised and argued--whether the VA's actions were reasonably calculated to end the sexual harassment by Norman Cortez
 
 
 [2]
 A "Report of Contact" is the VA's method of communication between management and staff. It is used primarily to communicate complaints, events, or meetings
 
 
 [3]
 The Report is actually dated 1/5/87. In its findings of fact, the district court stated that this Report was filed in January of 1988. The VA maintains that the district court is correct, and that the 1987 date is a mistake. Because there is no evidence nor arguments to the contrary, the district court's finding is not clearly erroneous
 
 
 [4]
 At oral argument, counsel for the VA stated that the obscene gesture consisted of Cortez giving Intlekofer "the finger," and that the obscene picture portrayed a dildo
 
 
 [5]
 Intlekofer filed a formal complaint with the E.E.O.C. in early February, after Reese completed her investigation and filed her report
 
 
 [6]
 Intlekofer argues that the VA had notice of the harassment as early as January, 1987. After listening to the testimony, however, the district court concluded that the VA did not have notice until April of that same year. This finding is not clearly erroneous
 
 
 [7]
 Judge Wiggins, in his dissent, determines that the behavior of Mr. Cortez did not constitute a prima facie case of sexual harassment. However, this issue was not properly before the court as it was not raised by the Veterans Administration on appeal
 
 
 [8]
 I do not understand Judge Keep's objection to my opinion given the description of appropriate disciplinary measures in the above paragraph
 
 
 [9]
 I want to highlight a point emphasized in Ellison: harassment is to be remedied through actions targeted at the harasser, not at the victim. In Ellison, we explained that
 the victim of sexual harassment should not be punished for the conduct of the harasser. We wholeheartedly agree with the EEOC that a victim of sexual harassment should not have to work in a less desirable location as a result of an employer's remedy for sexual harassment.
 Ellison, 924 F.2d at 882. Here, the VA's approach to the problem focussed as much on Intlekofer as it did on Cortez. Not only did the VA have numerous counselling sessions with Intlekofer in order to discuss how she could help stop the harassment, it forced Intlekofer to work different shift schedules and actively sought to have her transferred to a different position. While the VA apparently was trying to solve the situation, it did so at the expense of disrupting Intlekofer's life. This is not the price that victims must pay for reporting sexual harassment at the workplace. I realize that the VA also tried to change Cortez's schedule. But considered in isolation from the actions taken with respect to Intlekofer, those taken with respect to Cortez were minimal.
 
 
 [10]
 Because Intlekofer is the prevailing party in this appeal, we grant her request for attorney's fees under section 706(k) of Title VII, 42 U.S.C. § 2000(e-5)(k). The amount of fees shall be determined on remand
 
 
 [1]
 Webster's Third New International Dictionary 644 (1976) alternatively defines the noun form of the word "discipline" as "punishment: chastisement self-inflicted or imposed as a penalty or penance" and as "control gained by enforcing obedience or order." The verb form of "discipline" is defined "to inflict suffering on or to penalize for the sake of discipline, regularity, order, or rule," or "to train by instruction or exercise." Id. at 645
 
 
 [2]
 Moreover, to the extent that the opinion does create a standard requiring punishment, I question the conclusion reached by Judge Hall in Part III, that Ellison may be retroactively applied under the standard set out in Chevron Oil. I agree that employers have long been on notice, under the EEOC Compliance Guidelines, Hacienda Hotel, and case law of the Fourth and Eighth Circuits, that they are required under Title VII to intervene promptly and effectively to put an end to workplace sexual harassment. I do not believe that this court's discussion in Ellison of what remedial actions by employers shield them from liability under Title VII was intended to announce a new rule of law. While this court noted that "We have not addressed what remedial actions taken by employers can shield them from liability for sexual harassment by co-workers," (924 F.2d at 881), it noted that Hacienda Hotel had been clear that employers are liable for failing to remedy or prevent a hostile or offensive work environment of which management level employees knew. The Court further noted existing EEOC Guidelines addressing the subject, as well as cases from the Fourth and Eighth Circuits that required significant, prompt intervention
 Thus, while there were prior to Ellison no Ninth Circuit cases setting out in detail what is required of an employer, the employer seems to have been fairly on notice long before 1991 that it would be liable for harassment by a co-worker that it failed effectively to remedy. I would therefore agree that it is appropriate for this panel to look to Ellison as an example of this court's prior application of Title VII and the implementing EEOC Guidelines to a particular factual scenario. However, I do not believe that employers were fairly on notice even after Ellison that punitive measures are required to shield them from Title VII liability. To the extent that this is the proposed holding in this case, I cannot agree that this result was "clearly foreshadowed" by earlier case law.
 
 
 [1]
 I believe this to be dicta because the majority's problem with the VA is not its initial response to the complaints. Instead, the majority holds that "the VA's response to Intlekofer's repeated complaints was insufficient under Title VII."
 
 
 [2]
 I do not belittle the importance of remedying sexual discrimination as quickly as possible. I simply believe that there should be some latitude for an employer to adjust his response to the individual situation