**Denise McPHERSON, Plaintiff,**

v.

**HCA–HEALTHONE, LLC, a Colorado corporation, d/b/a The Medical Center of Aurora, DLLC, Defendant.**

**No. CIV.A.01–ES–0845 PAC.**

United States District Court, D. Colorado.

May 9, 2002.

Elwyn F. Schaefer, Denver, Elwyn F. Schaefer & Associates, PC, Denver, CO, for Plaintiff.

Lisa Hogan, Meghan W. Martinez, Susan Penniman Klopman, Brownstein, Hyatt & Farber, P.C., Denver, CO, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SCHLATTER, United States Magistrate Judge.

### INTRODUCTION

Defendant has filed a motion to dismiss all claims that have been asserted by plaintiff. Both parties have consented to the exercise of jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case has been referred to me for the purpose of all proceedings, including the entry of judgment.

Plaintiff Denise McPherson has filed a Complaint, stating a single cause of action

under Title VII against defendant HCA–HealthONE, LLC, d/b/a The Medical Center of Aurora ("the Medical Center"). 42 U.S.C. § 20000e et seq. Plaintiff is a surgical technician. She claims that she was subjected to sexual harassment from Dr. Pius Kamau, a private physician who she had assisted once during an operation.

In her Complaint, plaintiff alleges two bases for relief against the Medical Center. One, plaintiff asserts a claim for quid pro quo sexual harassment, alleging that Dr. Kamau "had a supervisory role" over her. And, two, plaintiff asserts that the Medical Center is liable because she reported the actions of Dr. Kamau to an appropriate person at the Medical Center, but the Medical Center failed to take action upon her complaint, thereby causing her to be subjected to a sexually hostile environment.

The Medical Center has filed a Motion for Summary Judgment. In its motion, the Medical Center argues that it cannot be held liable on a claim of quid pro quo sexual harassment because Dr. Kamau was never an employee of the Medical Center, and did not supervise plaintiff. The Medical Center also argues that it cannot be held liable on a theory of "hostile work environment" because the conduct that is at issue was neither severe nor pervasive.

The Medical Center's motion and the response of plaintiff raise the following four issues: (1) was Dr. Kamau an employee of the Medical Center; (2) if so, was Dr. Kamau a supervisor of plaintiff; (3) if Dr. Kamau was a supervisor of plaintiff, did his conduct constitute quid pro quo sexual harassment; and (4) was plaintiff subjected to a sexually hostile environment at the Medical Center, and, if so, did the Medical Center negligently fail to adequately address the circumstances?

I find that plaintiff has failed to demonstrate that genuine issues of material fact exist with regard to any of the four issues, and the undisputed facts support the entry of summary judgment in favor of defendant. I will grant the Medical Center's Motion for Summary Judgment.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence in the record must be viewed in the light most favorable to the nonmoving party, and the nonmovant must be allowed the benefit of all reasonable inferences to be drawn from the evidence. *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10TH Cir.1985).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A genuine factual issue is one that "can reasonably be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. 2505. A dispute over a material fact is genuine when the evidence

is such that a reasonable jury could find for the nonmovant. One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way consistent with this purpose. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

## I.

The following facts either are undisputed, or, where noted, are the subject of dispute. Where the facts are disputed, I find that the disputes relate to matters that are not material. I review the facts in the light most favorable to plaintiff.

At the time of the events in this case, plaintiff was employed by the Medical Center as a nurse who worked as a surgical technician. Her status at the Medical Center was that of a "traveler." When hospitals such as the Medical Center have need for nurses on a short-term basis, they turn to placement agencies which maintain a list of nurses who are willing to travel (hence, the term "traveler") to hospitals in different parts of the country. Hospitals contract for the services of travelers for limited periods of time. Plaintiff had been placed with the Medical Center by an organization called TVL Healthcare, and her initial contract was for 13 weeks. The contract was renewable if the Medical Center had ongoing needs for her services.

Dr. Pius Kamau is a medical doctor who had been granted "staff privileges" at the Medical Center. Dr. Kamau also had staff privileges at four or five other hospitals.

Plaintiff testified in her deposition that she was accosted by Dr. Kamau on two separate occasions, the first on September 19, 1999, and the second exactly 30 days later, on October 19, 1999. With regard to the first incident, plaintiff states that it happened after she had assisted Dr. Kamau in a surgery, and after they had both left the operating room. She describes the event as follows:

A.... Dr. Kamau was standing just outside of the doorway to the surgery desk, and I was walking towards him, and he stood there. He kind of looked at me and smiled, and as I approached him, he reached out and grabbed me. As I was going to go around him, he grabbed me across on this side and pulled me towards him. And he said, "You are just so cute" with his other arm coming around the back side of me, and he was rubbing my right breast and pulling me closer and closer. And I was trying to push him off me, and I told him, "Leave me alone." And I backed away, and I was in shock.

\* \* \* \* \* \*

Q.... [H]ow long [was he] in physical contact with you \* \* \* [f]rom the time he first grabbed you to when you got away from him.

A. I would say right around ten seconds, eight to ten seconds....

\* \* \* \* \* \*

Q. And the—the touching you described, the touching of your breast, can you be more specific about that?

A. His arm wrapped around me, and his side of his hand was up against my breast.

\* \* \* \* \* \*

Q. And what—what was that hand doing? Was it grabbing the breast? Was it fondling the breast? Was it just touching it? What?

A. It was brushing my breast.

Plaintiff testified that she pushed Dr. Kamau away, and proceeded to the nurses' lounge. At the lounge, she came upon Denise Maroney, who she described as the "OR coordinator/scheduler." Plaintiff testified that she told Ms. Maroney that she

had just been "grabbed by a doctor," and Ms. Maroney allegedly asked, "Was it Dr. Kamau?" Plaintiff stated that it was, and Ms. Maroney replied, "Well, he kind of has a problem with that.... I'll take care of it."

When Ms. Maroney was deposed, she denied that the discussion had occurred in this manner. She testified that "[t]he only statement that [plaintiff] had made to me was that she felt uncomfortable with Dr. Kamau," and plaintiff had offered no reason for her discomfort. Ms. Maroney stated that she responded to plaintiff's statement within the limits of her authority, which was to arrange the operating schedules such that plaintiff was no longer paired in any operating room with Dr. Kamau. However, she testified that she did not have control of "the daily assignments, the preassignments."

Thirty days after the first incident, on October 19, 1999, plaintiff encountered Dr. Kamau a second time. Between the first and second incidents, plaintiff had seen Dr. Kamau only once, when he was scrubbing at a scrub sink. On that occasion, they apparently did not speak with one another. On October 19, she stated that she was nervous about seeing the doctor because she did not know whether anyone had spoken to him.

Plaintiff testified that on October 19 she was walking toward the women's locker room when she saw Dr. Kamau speaking with Paula Besinger (or "Businger") near the locker room doorway. Plaintiff states that she ducked into a room, to wait and see if Dr. Kamau would leave. However, when he did not leave after a minute, plaintiff headed for the door to the locker room. She describes the contact with Dr. Kamau as follows:

A. ... Paula looks at me, and he turns and looks and sees it's me. I immediately just go right—start to go right through him. I reach for the door handle. I said, "Excuse me," and I go for the door handle between them. And he grabs me again in the same manner as he does—did the first time. He wrapped his left arm around in front of me while his right arm was down beside us encasing me with his left arm. Then his right arm went down and patted my butt and then grabbed it, out of sight of Paula, and she's standing there.

\* \* \* \* \* \*

I push him away, and I said, "Leave me alone." And I start to go through the door, and he goes, "Where are you going?" I said, "I'm going home. Leave me alone," and I was very angry. And I went to my locker. I was trembling. And at that point I knew that they hadn't said anything to him.

Plaintiff resolved after this second incident to lodge a formal complaint against Dr. Kamau by speaking with one of her supervisors. Two days after the incident, plaintiff states that she went to the office of Gretchen Pitt, "[b]ecause she is the person over everybody in the OR." She spoke with Ms. Pitt for ten or fifteen minutes. Later, apparently the same day, plaintiff was preparing for an operation when another nurse relieved her, that nurse informed plaintiff that she was to report to the office of the Director of Human Resources, Allen Mitzel, right away. Plaintiff did so. Present at Mr. Mitzel's office were both Mr. Mitzel and Gretchen Pitt. During an interview that lasted approximately 20 to 30 minutes, plaintiff repeated her complaint for the two of them.

On October 25, 1999, Dr. Kamau was interviewed by Mr. Mitzel in regard to plaintiff's complaint. According to Mr. Mitzel, Dr. Kamau responded to the interview by saying that he never, at any time, intended to sexually harass plaintiff, and stated, "I truly apologize if I offended her.

I am very, very sorry." However, Dr. Kamau denied to Mr. Mitzel, and denied in his deposition, that his encounters with plaintiff happened in the manner that she described.

During Dr. Kamau's deposition, evidence was discussed that reflects that the Medical Executive Committee recommended to Dr. Kamau that he "submit to an evaluation of his understanding of physician/employee boundaries and actions which could be considered harassment." The Committee also informed Dr. Kamau that failure to follow up with its recommendation "could result in termination of his medical staff membership." On November 4, 1999, apparently in compliance with directions from the Committee, Dr. Kamau sent a letter to plaintiff in which he denied that he had touched her in the manner that she had described to the hospital authorities. However, he stated that he "never intended any of my actions to be offensive, sexual or otherwise." He asked that she "[p]lease accept this as my apology, and I profusely regret that you interpreted any conduct on my part as sexual harassment."

On November 9, 1999, plaintiff's contract with the Medical Center was renewed for another 13 week period. No further incidents with Dr. Kamau ever occurred.

## II.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Congress defined "employer" as a "person engaged in an industry affecting commerce... *and any agent of such a person.*" 42 U.S.C. § 2000e(b) (emphasis added).

Relying upon decisions by the United States Supreme Court, the Tenth Circuit has interpreted Title VII to prohibit two types of sexual harassment:

quid pro quo sexual harassment and hostile work environment sexual harassment. Quid pro quo sexual harassment involves the conditioning of tangible employment benefits upon the submission to sexual conduct. *See Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir.1987). Hostile work environment harassment occurs "where '[sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982)).*Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 575–76 (1990).

█ In certain circumstances, an employer may be found to be liable for the actions of its agents, such as supervisors, as well as for the actions of its employees. In the *Meritor* case, the Supreme Court declined to "issue a definitive rule on employer liability." *Meritor,* 477 U.S. at 72, 106 S.Ct. 2399. Instead, the Court determined that "Congress wanted courts to look to agency principles for guidance in this area." *Id.*

Acting upon this general guidance from the Supreme Court, the Tenth Circuit has adopted the general principles of agency that are contained at § 219(1) and (2) of the *Restatement (Second) of Agency,* and

has identified three alternative bases for holding an employer liable for an agent's hostile work environment sexual harassment:

> An employer is liable for: (1) any tort committed by an employee acting within the scope of his or her employment; (2) any tort committed by an employee in which the employer was negligent or reckless; or (3) any tort in which the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or the employee was aided in accomplishing the tort by the existence of the agency relation.

*Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 783 (10th cir.1995); *see also Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1417–18 (10th Cir.1987).

### III.

#### A. Was Dr. Kamau an employee?

■ Plaintiff argues in her Response that "[a] physician who enjoys hospital staff privileges does, under certain factual situations, share an indirect employer-employee relationship with the hospital sufficient to invoke Title VII protection." Plaintiff cites the case of *Shrock v. Altru Nurses Registry,* 810 F.2d 658, 660 (7th Cir.1987), to support this proposition. Plaintiff further argues that I should look to a Fourth Circuit Decision to assist me in determining whether Dr. Kamau was an employee of the Medical Center. That decision listed 10 factors to consider in determining whether a person was subject to an employer-employee relationship. *Bender v. Suburban Hospital,* 159 F.3d 186, 190 (4th Cir.1998) (holding that the relevant law for defining an employment relationship is the general common law of agency).

First, the *Shrock* case does not say or hold what plaintiff has represented that it holds. The Seventh Circuit merely stated that courts in other jurisdictions have held that hospitals may be liable to a doctor when the hospitals attempted to interfere on the basis of sex with the relationship between a doctor and his or her patients. *Shrock* at 660, *citing Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338 (D.C.Cir.1973), and *Doe v. St. Joseph's Hospital,* 788 F.2d 411, 421–25 (7th Cir. 1986). The Seventh Circuit concluded that the cases in the other jurisdictions were distinguishable from the facts before it, which did not involve a doctor-patient relationship.

Second, even the mention of the above-stated proposition by the Seventh Circuit is undermined by the fact that it has since rejected the ruling in the *Sibley* case, and has overruled its own ruling in *Doe v. St. Joseph's Hospital. See Alexander v. Rush North Shore Medical Center,* 101 F.3d 487 (7th Cir.1996). Third, plaintiff need not have looked any further than the Tenth Circuit for a recital of the factors to consider in determining whether Dr. Kamau is an employee of the Medical Center. The Tenth Circuit has set forth such factors in the case of *Lambertsen v. Utah Dept. of Corrections,* 79 F.3d 1024, 1028 (10th Cir.1996). In that case, a teaching assistant at a correctional facility sued under Title VII. The district court held that plaintiff was not an employee of the department of corrections, but was, instead, an employee of the school district with which the department contracted for the supply of teachers. In affirming the district court's findings, the Tenth Circuit found that the district court had properly based its decision upon the "hybrid test" for determining the existence of an employment relationship, but the Tenth Circuit held as well that it would not have been improper for the court to use a common law agency approach. *Id.* The Tenth Circuit expressed its agreement with the Ninth, Eighth and Second Circuits in stat-

ing that it saw "no discernible difference between the hybrid approach and the common law agency approach." *Id.; Folkerson v. Circus Circus Enterprises,* No. 93–17158, 1995 WL 608432 at *3, 68 F.3d 480 (9th Cir.1995); *Wilde v. County of Kandiyohi,* 15 F.3d 103, 106 (8th Cir.1994); *Frankel v. Bally,* 987 F.2d 86, 90 (2d Cir. 1993).

■ Under the hybrid test that has been approved by the Tenth Circuit, the court's main focus must be upon "the employer's right to control the 'means and manner' of the worker's performance." *Id.* However, the court may also consider the following factors:

(1) the kind of occupation at issue, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the employer pays social security taxes; and (11) the intention of the parties.

*Id.*

Plaintiff argues that Dr. Kamau is an employee of the Medical Center because of the following factors: (a) the Medical Center can determine his "on call" schedule; (b) the Medical Center can determine when he could perform surgeries; (c) Dr. Kamau used the Medical Center's equipment to perform surgeries; (d) Dr. Kamau had been "working for" the Medical Center since 1980, and "had done little work for other hospitals;" (e) Dr. Kamau's assis-

tants were employed by the Medical Center; (f) surgeries were part of the Medical Center's regular business; (g) Dr. Kamau's job performance was regularly reviewed by the Medical Center every two years; and (h) the Medical Center had the power to revoke Dr. Kamau's practice privileges if his work was substandard. Plaintiff's Response at 10.

I will consider plaintiff's arguments in the same order as above. (a) As the Seventh Circuit noted, a doctor's compliance with an "on call" schedule is not the type of restraint that will create an employer-employee relationship between a hospital and a physician. *Alexander v. Rush North Shore Medical Center,* 101 F.3d at 493.(b) The mere scheduling of surgeries by a hospital is not the type of control that would give rise to an employer-employee relationship.(c) Every physician uses the equipment of hospitals to perform surgeries, but the mere use of the hospital's equipment does not cause the hospital to become the employer of the doctors who use the equipment. (d) The length of time that any physician has privileges at a hospital does not cause the privileges to ripen into employment; (e) The use of a hospital's employees to assist in a surgery does not make the surgeon an employee of the hospital. (f) The fact that surgeries are a part of the Medical Center's regular business is meaningless with regard to any relationship between the hospital and doctors with staff privileges. Doctors enter into agreements for staff privileges not to become employees of the hospital, but because they need places to perform surgeries. Finally, (g) and (h), even though the Medical Center could review Dr. Kamau's performance, and could withdraw his privileges to practice at the Medical Center, these powers allowed the Medical Center only to affect the place of Dr. Kamau's practice, and, to a certain extent, the professional manner in which Dr. Kamau was

expected to perform his surgeries. However, the fact that the Medical Center set professional standards for doctors to meet, and conditioned staff privileges upon compliance with these standards, does not alter the status of doctors from that of independent contractors to one of employees.

Plaintiff has done nothing more than to describe factors that are generic to all doctors. In effect, if Dr. Kamau is an employee of the Medical Center, then virtually all physicians with staff privileges at the Medical Center would be its employees, an obvious absurdity.

Plaintiff has failed to focus upon the factors that are of central concern in a determination of the status of a doctor as an employee or as an independent contractor, and has failed to present any evidence that might demonstrate that Dr. Kamau happens to be a physician who was employed by the Medical Center: for example, whether Dr. Kamau is a specialist who operates without supervision, or whether the type of work he does is usually done under the direction of a supervisor; whether Dr. Kamau has his office at the hospital, or maintains an independent office; whether the hospital pays any form of salary or benefit to Dr. Kamau; whether Dr. Kamau billed his patients directly and/or was paid directly by them; whether Dr. Kamau was required to admit all of his patients to the Medical Center and to no other hospital, or whether he could treat his patients at other facilities; and, ultimately, what was the intention of the Medical Center and Dr. Kamau with respect to his status as an employee or independent contractor?

The undisputed facts demonstrate that the status of Dr. Kamau is that of an independent contractor. Dr. Kamau practiced at five or six hospitals, and was not restricted to a practice at the Medical Center. He was not paid by the Medical Center, and received no benefits of any type from it. He himself viewed his status as that of an independent contractor. As such, he himself could determine whether he performed surgeries, and, consistent with the scheduling and availability of operating rooms, when he performed surgeries.

The "privileges" that were provided by the Medical Center were merely the privileges to utilize the facilities, equipment and staff that were provided by the Medical Center. However, the privilege to use facilities, equipment and staff, without more, does not translate into an employer-employee relationship. Thus, the undisputed evidence reflects that Dr. Kamau is an independent contractor, and is not an employee of the Medical Center.

Other courts have considered whether a physician with staff privileges is an independent contractor or an employee, and have reached the same conclusion as I have reached here. *Alexander v. Rush North Shore Medical Center,* 101 F.3d at 493 (under common law agency test, physician not an employee of hospital for purposes of Title VII claim by physician); *Lutfi, M.D. v. Brighton Community Hospital Ass'n,* 40 P.3d 51 (Colo.App.2001) (adopting test of Tenth Circuit in *Lambertson v. Utah Dept. of Corrections,* and holding that physician was an independent contractor who could not maintain a claim under Title VII); *Diggs v. Harris Hospital–Methodist, Inc.,* 847 F.2d 270 (5th Cir. 1988) (physician with staff privileges does not qualify as an employee for purposes of Title VII); *Pamintuan, M.D. v. Nanticoke Memorial Hospital,* 1997 WL 129338 at *11 (D.Del.1997) (same); *Nanavati, M.D. v. Burdette Tomlin Memorial Hospital,* 1986 WL 15318 (D.N.J.1986) (same); *see also Cooper v. R.L. Curry, M.D.,* 92 N.M. 417, 589 P.2d 201, 203 (1978) (physician held to be an independent contractor for

purposes of malpractice action against the hospital).

Given the undisputed evidence before the court, no reasonable jury could conclude that Dr. Kamau was an employee of the Medical Center.

### B. Was Dr. Kamau plaintiff's supervisor?

█ Although I have found and concluded that Dr. Kamau is not the employee of the Medical Center, I will address the second issue nevertheless: whether Dr. Kamau was plaintiff's supervisor. As I noted above, the Tenth Circuit has stated that an employer is liable for any tort committed by an employee acting within the scope of his or her employment, and by any supervisor in which he or she purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or the employee was aided in accomplishing the tort by the existence of the agency relation. *Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d at 783.

I address only briefly the first test for supervisory liability, whether Dr. Kamau was acting within the scope of his employment during his encounters with plaintiff. First, I have found that Dr. Kamau was not an employee of the Medical Center. As such, he could not be found to be acting within the scope of any such employment. More importantly, as the Tenth Circuit has noted, § 291(1) of the *Restatement* is largely inapplicable in the context of cases that involve sexual harassment because " '[s]exual harassment simply is not within the job description of any supervisor or any other worker in any reputable business.' " *Hicks v. Gates Rubber Co.,* 833 F.2d at 1417–18 (quoting Holtzman & Trelz, *Recent Development in the Law of Sexual Harassment: Abusive Environment Claims after Meritor Savings Bank v. Vinson,* 31 St. Louis U.L.J. 239, 276 (1987)).

The second test for supervisory liability is whether Dr. Kamau purported to act on behalf of the Medical Center, whether plaintiff relied upon his apparent authority to do so, and/or whether Dr. Kamau was aided in accomplishing his actions by the existence of the agency relation. *Hirschfeld,* 916 F.2d at 579 (quoting *Restatement (Second) of Agency* § 219(2)(d)). The Tenth Circuit has stated that " '[a]n individual qualifies as an 'employer' under Title VII if he or she serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment.' " *Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir. 1993); *Parkins v. Civil Constructors of Ill.,* 163 F.3d 1027, 1034 (7th Cir.1998) (the essence of supervisory status is the "power to hire, fire, demote, promote, transfer, or discipline an employee"). In such circumstances, the supervisor operates as the alter ego of the employer, "and the employer is liable for the unlawful employment practices of the individual without regard to whether the employer knew of the individual's conduct." *Id.*

█ Quid pro quo sexual harassment occurs when an employee's supervisor conditions tangible employment benefits upon sexual conduct. *Hicks v. Gates Rubber Co.,* 833 F.2d at 1413. Employers are held strictly liable for the actions of its supervisors who engage in quid pro quo sexual harassment because the harasser wields the employer's authority to alter the terms and conditions of employment. *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.1994). Heightened liability exists also because the "acts of supervisors have greater power to alter the environment than acts of co-employees generally...." *Faragher v. City of Boca Raton,* 524 U.S. 775, 805, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Because liability is predicated on misuse of supervisory authority, the touch-

stone for determining supervisory status is the extent of authority possessed by the purported supervisor. *Wright–Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1271 (10th Cir.1998) (the operative question in determining supervisory status is whether the employee in question "had sufficient control over the plaintiff to be considered her supervisor . . . .").

Plaintiff has presented no evidence that demonstrates that Dr. Kamau was empowered with the authority to make decisions with regard to the hiring, firing or conditions of employment for plaintiff. *Sauers,* 1 F.3d at 1125. Plaintiff asserts that Dr. Kamau "supervised [plaintiff] on how to do everything in the operating room . . .," and "had the power to remove [her] from the OR" if he did not like her performance. Finally, plaintiff argues that the power of a physician such as Dr. Kamau to provide "feed-back and/or evaluations" could "make or break" a traveling nurse such as plaintiff.

None of the powers described by plaintiff leads to the conclusion that Dr. Kamau was plaintiff's supervisor. Dr. Kamau's relationship to a nurse such as plaintiff is analogous to that of an airplane pilot to the flight attendants. The Fourth Circuit noted that pilots exercised some authority over the flight attendants, but the authority did not include the authority to "hire, fire, promote, or demote flight attendants." *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987). Similarly here, Dr. Kamau no doubt possessed the authority to direct the actions of the staff and technicians who assisted him in surgery, but plaintiff has not demonstrated that his power included the power to hire, fire or alter the conditions of their employment.

■ It may be true, as plaintiff suggests, that Dr. Kamau could provide "feed-back" on plaintiff to her supervisors, but "[a]n individual is not a supervisor unless he possesses the authority to *directly* af-

fect the terms and conditions of a victim's employment." *Hall v. Bodine,* 276 F.3d 345, 355 (7th Cir.2002). The ability of a doctor to comment upon the performance or skills of a nurse does not translate into the power to fire a nurse. In a hospital setting, a doctor's power to fire a nurse would literally vest dozens, if not hundreds, of doctors with the authority to fire any nurse they chose. The chaos that would ensue is self-evident. The power of a doctor to exclude a nurse from all surgeries with that particular doctor is still not the power to fire the nurse. It is merely the power to exclude that nurse from surgery with that doctor. *See e.g., Pfau v. Reed,* 125 F.3d 927, 937 (5th Cir. 1997) (holding that an employee was not a supervisor where he had only the authority to recommend that employees receive awards or be subject to disciplinary action).

At best, one might suggest that Dr. Kamau possessed certain "non-supervisory authority" over plaintiff. However, "[t]he mere delegation of non-supervisory authority to [a person] does not give rise to employer liability under section 219(2)(d) [of the *Restatement* ]." *Hirschfeld,* 916 F.2d at 578, n. 7.

### C. Did Dr. Kamau engage in quid pro quo harassment?

■ As I stated in the preceding section, quid pro quo sexual harassment involves the conditioning of tangible employment benefits upon the submission to sexual conduct. *Hicks v. Gates Rubber Co.,* 833 F.2d at 1413. Only a supervisor of an employee may commit quid pro quo sexual harassment because only a supervisor has the authority to alter the terms and conditions of an employee's employment. I have concluded that the undisputed facts demonstrate that Dr. Kamau was not plaintiff's supervisor. Thus, even if he engaged in sexual harassment, it

cannot be quid pro quo sexual harassment.

■ However, even if I were to have concluded that Dr. Kamau was plaintiff's supervisor, plaintiff has not presented any evidence that demonstrates that Dr. Kamau's actions would constitute quid pro quo harassment. He did not purport to act on behalf of the Medical Center during his interactions with plaintiff. He said nothing to plaintiff that remotely suggests that she was expected to comply with his actions or she would suffer negative consequences to her employment, or that she would receive positive enhancements to her employment if she cooperated. *See Hirschfeld*, 916 F.2d at 578. Nothing in plaintiff's testimony suggests that she perceived Dr. Kamau to have been "aided" in his actions toward her by an alleged status as her supervisor, nor did plaintiff even imply that she relied upon such a status. Thus, plaintiff has failed to present any evidence that demonstrates the existence of any quid pro quo harassment by Dr. Kamau.

**D. Was plaintiff subjected to a sexually hostile environment, and, if so, did the Medical Center neglect to remedy the circumstances?**

■ **1. Sexually hostile environment.** Even though Dr. Kamau is not an employee of the Medical Center, and even though I have found that he did not act as plaintiff's supervisor, the Medical Center may nevertheless be subjected to liability for the actions of Dr. Kamau if certain circumstances are found to have existed. As noted above, the Tenth Circuit has held that under the *Restatement (Second) of Agency*, § 219(2)(b), an employer may be held liable for any tort committed by an employee in which the employer was negligent or reckless. *Hirschfeld*, 916 F.2d at 577; *Hirase–Doi v. U.S. West Communications, Inc.*, 61 F.3d at 783. "Employer

negligence in this context is defined as 'failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known.'" *Hirschfeld* at 577 (quoting *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1516 (9th Cir.1989)).

■ The Tenth Circuit has held that "an employer may be responsible for sexual harassment based upon the acts of nonemployees." *Turnbull v. Topeka State Hospital*, 255 F.3d 1238, 1244 (10th Cir. 2001), *citing Lockard v. Pizza Hut*, 162 F.3d 1062, 1073 (10th Cir.1998). Thus, whether Dr. Kamau was an employee of the Medical Center, or was plaintiff's supervisor, is not dispositive with regard to the Medical Center's potential liability for Dr. Kamau's actions. For employer negligence, the focus is not on the conduct of the parties, but on the employer's behavior in response. *Turnbull v. Topeka State Hospital*, 255 F.3d 1238, 1244 (10th Cir. 2001). As the Tenth Circuit has noted, "a hospital cannot control every act of its patients, but it does control the environment at large." *Id.* To the extent that the Medical Center has some control over the actions of the doctors who enjoy staff privileges, it can be held liable for its failure to address or correct the sexually inappropriate conduct of the physicians.

In order for plaintiff to avoid summary judgment, she must demonstrate that a genuine issue of material fact exists with regard to two issues: (1) that she was, in fact, subjected to a hostile work environment, and (2) that she complained to the Medical Center, and it failed or neglected adequately to address the problem. *See Hirschfeld* at 577. I find and conclude that no reasonable jury that considers the evidence that has been presented by plaintiff could find in favor of plaintiff on either of these propositions.

To demonstrate the existence of a hostile work environment, plaintiff must present evidence that reflects that the actions of Dr. Kamau were "sufficiently severe or pervasive 'to alter the conditions of [her] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399. The Supreme Court has held that "[c]onduct that is not severe or pervasive enough to create an objectively hostile environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

The Supreme Court has recognized that the standard for determining an actionable hostile work environment cannot be "a mathematically precise test." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir.1998). Instead, the Court has set forth a nonexhaustive list of factors that are relevant to the determination:

> the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris* at 23, 114 S.Ct. 367. In addressing this issue, courts are directed to consider the totality of circumstances, and to be aware that "no single factor is required." *Id.* Based on the totality of circumstances, the environment must be perceived both subjectively and objectively as abusive. *Id.* 21–23, 114 S.Ct. 367.

I have no doubt that plaintiff subjectively perceived Dr. Kamau's actions to be severe, threatening and personally humiliating. However, viewing the totality of circumstances as presented by plaintiff, no reasonable jury could conclude that plaintiff was subjected to a hostile work environment.

In the first incident described by plaintiff, she states that Dr. Kamau grabbed her in a hug, telling her "you are so cute," during which the side of his hand rubbed or brushed against her breast. Plaintiff testified that she pushed away from the doctor and proceeded on her way. Plaintiff presents no evidence that Dr. Kamau's actions were accompanied by any lewd suggestions or propositions. The incident occurred in a public hallway, or at least public to the extent that it was used by medical personnel. Although plaintiff apparently *perceived* Dr. Kamau's actions as sexual in nature, she does not describe circumstances that suggest that Dr. Kamau cupped or fondled her breast in a sexual manner, such that his action was intended to arouse either plaintiff or himself. Viewing the facts in the light most favorable to plaintiff, no reasonable fact finder could conclude that this momentary brushing or touching of plaintiff's breast during the hug from Dr. Kamau constituted an action that was sufficiently severe that it altered her work environment. Plaintiff herself describes no alteration in her work environment other than her effort to avoid Dr. Kamau.

Plaintiff also has not demonstrated that the conduct by Dr. Kamau was pervasive. Plaintiff had such little contact with Dr. Kamau that she saw him only once, briefly, between the first and second incidents. The first and second incidents were thirty days apart.

In the second incident described by plaintiff, she states that Dr. Kamau again grabbed her in a hug. This time, plaintiff states, he "patted my butt and then grabbed it." Though plaintiff was undoubtedly offended by Dr. Kamau's actions, she has not demonstrated that the conduct at issue was so severe or pervasive

that a reasonable jury could conclude that the terms or conditions of her employment were altered. Plaintiff does not describe circumstances from which a reasonable jury could conclude that Dr. Kamau was engaging in a sexual touching or groping. In fact, plaintiff states that Paula Businger, another woman nurse, was standing right next to Dr. Kamau, speaking with him when plaintiff approached and was embraced by the doctor. Although plaintiff states that Ms. Businger could not have seen Dr. Kamau's hands, because plaintiff's back was away from Ms. Businger, Ms. Businger herself has testified otherwise:

A. Dee's [plaintiff's] back was to me and Dr. Kamau was facing me. And I was looking at her back.

Q. Now, were you looking at her back during the entire time that Dr. Kamau and Dee McPherson were in physical contact with one another?

A. Mm-hmm, yes.

Q. Did Dr. Kamau grab Dee McPherson's buttocks?

A. No.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. What did [Dr. Kamau] do to Denise McPherson's buttocks?

A. Nothing that I saw.

Regardless of which version of events is believed, the fact remains that the hugging of plaintiff by Dr. Kamau occurred in the immediate presence of another person, undermining any inference that Dr. Kamau was engaging in activity that he intended as sexual.

▆▆ However, even if plaintiff's version of the events is taken as true, the two incidents that she describes do not constitute events that are "sufficiently severe or pervasive" to the point that they altered her work environment. "Because only the employer can change the terms and conditions of employment, an isolated incident of harassment by a co-worker will rarely

(if ever) give rise to a reasonable fear that sexual harassment has become a permanent feature of the employment relationship." *Brooks v. City of San Mateo,* 229 F.3d 917, 924 (9th Cir.2000). For example, in the *Brooks* case, the harasser initially placed his hand on plaintiff's stomach and made a lewd comment. He then forced his hand underneath her sweater and bra to fondle plaintiff's bare breast until Brooks was able to push him away. The Ninth Circuit held that "[n]o reasonable woman in Brooks's position would believe that [harasser's] misconduct had permanently altered the terms or conditions of her employment".

The Tenth Circuit has held that "a single incident of physically threatening conduct can ... be sufficient to create an abusive environment." *Lockard v. Pizza Hut, Inc.,* 162 F.3d at 1072. For example, in the *Lockard* case, a waitress was subjected to lewd remarks from customers, and, after her employer refused her request for assistance, one of the customers pulled her hair, then grabbed her breast and placed his mouth on it. The Court of Appeals stated that the customers' conduct was "physically threatening and humiliating," and held that the waitress was entitled to a trial with regard to her employer's negligence.

Because one or two incidents of harassment may not constitute conduct that is sufficiently "pervasive" to alter the conditions of the victim's environment, the second leg of the *Meritor* test, the requirement that the conduct be "severe," becomes all the more important. A plaintiff who fails to demonstrate that one or two incidents of alleged sexual harassment were sufficiently serious to alter the workplace environment risks the dismissal of her claims on summary judgment. *See, e.g., Scott v. Sears, Roebuck & Co.,* 798 F.2d 210, 211 (7th Cir.1986)

(plaintiff who complained of repeated harassing conduct from co-employees, including propositions, winks, suggestions for sex in response to requests for assistance, comments that she must moan and groan while having sex, and who was slapped once on the buttocks, held to have failed to show that conduct was so intimidating, offensive or hostile that it affected the terms, conditions or privileges of her employment); *Saxton v. American Tel. & Telegraph Co.*, 10 F.3d 526, 528, 534 (7th Cir.1993) (placement of hand on plaintiff's leg and kissing her until she pushed away, followed three weeks later by lurching at plaintiff from behind some bushes and unsuccessfully trying to grab her, not severe enough to create hostile environment); *Burnett v. Tyco Corp.*, 203 F.3d 980, 984–85 (6th Cir.2000) (three alleged actions during six-month period by personnel manager, who placed pack of cigarettes inside employee's tank top and brassiere strap, saying "you have lost your cherry," and made two other vulgar comments to plaintiff on other occasions, held under the totality of circumstances to be a single battery coupled with two merely offensive remarks, insufficient to create a hostile work environment); *Dunegan v. City of Council Grove*, 77 F.Supp.2d 1192, 1198 (D.Kan.1999) (co-employee attempted on two occasions within a short period of time to kiss plaintiff, held not sufficient to establish an objectively hostile work environment); *Stoeckel v. Environmental Management Systems, Inc.*, 882 F.Supp. 1106, 1114–15 (D.D.C.1995) (employee's attempts to kiss plaintiff, lewd remarks about her appearance, following plaintiff around the office, unsolicited neck rubs and hand-holding did not rise to level of severity for abusive work environment).

The Supreme Court has stated:

The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment.... We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory "conditions of employment."

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Plaintiff has directed me to an unpublished Tenth Circuit Court opinion in which the Court overruled the summary judgment that had been entered in favor of the defendant employer. *Rogers v. City County Health Dept. of Okla. Co.*, 2002 WL 241296, 30 Fed.Appx. 883 (10th Cir. 2002). However, the facts in that case are distinguishable from the facts here. The harasser in *Rogers* was plaintiff's supervisor with whom she had continual contact over an eight-year period, which is far different from the facts in this present case. In *Rogers*, the supervisor sexually harassed plaintiff twice during a two-week period. On one occasion, he continued to kiss her over her objections, while simultaneously telling plaintiff that "he would help arrange for her workplace to be moved to a different building and for her to receive a raise of $1,000.00 per month." *Id.* at *1, 30 Fed.Appx. 883. The Court of Appeals found this to be a troubling scenario because "the alleged harasser is not simply a co-worker..., but is instead the highest ranking official in the Health Department." *Id.* at *3, 30 Fed.Appx. 883. Additionally, the Court noted that the harasser was forcing himself upon plaintiff at a time when she was specifically requesting his assistance in addressing issues related to her work. *Id.*

The circumstances here are different from those in *Rogers*. Dr. Kamau was not plaintiff's supervisor; he had only two contacts with her, and during the two encounters with plaintiff he made no suggestions of any kind. Thus, the *Rogers* case has no persuasive value here.

■■■■ In determining whether workplace harassment constitutes discrimination because of sex, "the critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80, 118 S.Ct. 998. The plaintiff in *Rogers* clearly was subjected to a "disadvantageous term or condition of employment" because the offer of a raise and a better office was implicitly, if not explicitly, conditioned upon her response to her supervisor's kisses, a condition that presumably would not be imposed upon male employees. However, "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365 (10th Cir.1997) (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399). Even if plaintiff in this present action feels that she was harassed, she has presented no evidence that the actions to which she was subjected by Dr. Kamau were sufficiently severe that they affected a term, condition or privilege of her employment.

Given the undisputed evidence, and considering the factors that are outlined by the Supreme Court in *Harris*, plaintiff has failed to present evidence that shows that Dr. Kamau's actions were so frequent, severe, humiliating or physically threatening that his actions caused the terms and conditions of plaintiff's workplace to be altered. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367. Thus, plaintiff has not demonstrated the existence of a sexually hostile environment.

■■■■ **2. Negligence of the Medical Center.** In order to avoid summary judgment, plaintiff must also demonstrate the absence of any genuine issue of material fact with regard to the negligence of the Medical Center. "The negligence analysis can be divided into two separate inquiries, looking 'first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses.'" *Turnbull v. Topeka State Hospital*, 255 F.3d 1238, 1244 (10th Cir.2001) (quoting *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir.1998)).

■■■■ With regard to the employer's knowledge, a plaintiff may prove actual knowledge based on her reports of harassment to management-level employees or constructive knowledge based on the pervasiveness of the sexual hostility within the working environment. *Id.* Plaintiff has provided no evidence of any pervasive sexual hostility within the Medical Center. Thus, she must rely upon evidence that she complained to management, and provided them with sufficient information that would reasonably cause them to perceive a need for investigation and a possible responsive action.

After being hugged by Dr. Kamau on the first occasion, plaintiff states that she came upon Denise Maroney in the lounge. Plaintiff testified that she told Ms. Maroney that she had just been "grabbed by a doctor." However, plaintiff does not state that Ms. Maroney was her supervisor. The record before the court in these summary judgment proceedings is such that I cannot conclude that Ms. Maroney either had any supervisory authority, or would be a management-level employee to whom an employee such as plaintiff would be expected to complain in the event of alleged

sexual harassment. Plaintiff has presented no evidence about Ms. Maroney's level of authority other than the fact that she was the "OR coordinator/scheduler." As discussed above, the fact that Ms. Maroney may have had some "non-supervisory" authority over the scheduling of operating rooms does not render her a management-level employee for purposes of receiving complaints. Ms. Maroney herself testified that she had no control over the daily assignments of operating rooms, but that she was able to address plaintiff's complaint within the limits of her authority, which were to arrange the schedules for the staff in a manner that ensured that plaintiff would not be paired with Dr. Kamau.

■ Additionally, even if Ms. Maroney was a management-level employee, plaintiff has not presented any evidence from which a reasonable jury could conclude that plaintiff had provided Ms. Maroney with enough information to lead Ms. Maroney to conclude that plaintiff was speaking about sexual harassment, and was expressly asking for an investigation by the Medical Center.

An "employer's liability results if the employer ... 'had reason to to believe that an undue risk of harm would exist because of the employment. The employer is subject to liability only for such harm as is within the risk.'"

*Jeffries v. State of Kansas,* 147 F.3d 1220, 1229 (10th Cir.1998) (quoting *Hirase–Doi,* 61 F.3d at 784, and *Restatement (Second) of Agency* § 123, cmt (d)).

Plaintiff testified that she told Ms. Maroney, "I was just grabbed by a doctor." Plaintiff did not specify to Ms. Maroney whether it was the grabbing, or the particular doctor, that caused offense to her. Even viewing plaintiff's statement in the light most favorable to plaintiff, that single comment is the extent of the information that she provided to Ms. Maroney. According to plaintiff, Ms. Maroney replied that Dr. Kamau "kind of has a problem with that," and she would "take care of it." However, the record is replete with examples of testimony from others who say that Dr. Kamau was notorious for hugging people, with no evidence that anyone other than plaintiff had complained that she had been hugged in a sexual or suggestive manner. Plaintiff cannot now construe her extremely ambiguous comment, and the vague conversation between herself and Ms. Maroney, into one where she has satisfied the requirements for lodging a complaint about sexual harassment with the proper managerial authority.

■ The Tenth Circuit has stated, "[w]e have established no bright-line rule for measuring the 'appropriateness' of an employer's response, asking instead whether the response was reasonable under the circumstances." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d at 675–76. Even if I were to assume that Ms. Maroney was a management-level employee, and even if I were to assume that plaintiff's brief remark provided the Medical Center with knowledge of a problem that required some level of response, I note that Ms. Maroney on behalf of the Medical Center responded in a manner that was "reasonable under the circumstances" that were presented by plaintiff.

"What is reasonable depends on the gravity of the harassment.... [A]n employer is required to take more care, other things being equal, to protect its female employees from serious sexual harassment than to protect them from trivial harassment."

*Jeffries v. State of Kansas,* 147 F.3d at 1229 (quoting *Baskerville v. Culligan Internat'l Co.,* 50 F.3d 428, 432 (7th Cir. 1995)). Since plaintiff did not specify with Ms. Maroney that she was being sexually harassed by Dr. Kamau, but only com-

plained of having been grabbed, Ms. Maroney's response was not unreasonable: she took steps to ensure that plaintiff would not again be paired with Dr. Kamau in an operating room.

With regard to plaintiff's first encounter with Dr. Kamau, standing alone, plaintiff has failed to present any evidence that she directed a complaint to someone with supervisory authority, and failed to present any evidence that she made explicit that she was complaining with regard to sexual misconduct. To the extent that plaintiff complained to someone about an unwelcome grab by Dr. Kamau, the problem was addressed in a reasonable manner, as discussed above.

 After being hugged by Dr. Kamau on the second occasion, plaintiff resolved to file a complaint. Her decision and her actions demonstrate that she was aware of the proper manner in which to present a complaint of sexual harassment pursuant to the sexual harassment policy that governed the employees of the Medical Center. Plaintiff testified that she went to the office of Gretchen Pitt, "[b]ecause she is the person over everybody in the OR." That conversation caused Ms. Pitt to take plaintiff's complaint to even higher-level management, the Director of Human Resources. The investigation by the Director resulted in further investigation and ultimately a response from the Medical Executive Committee for the hospital.

In her Introduction to her Response to defendant's Motion for Summary Judgment, plaintiff appears to argue that the response of the Medical Center to her complaint was inadequate, and Dr. Kamau was never subjected to any discipline. The Tenth Circuit stated in the *Turnbull* case that "[i]t is not always possible for an employer to completely eliminate offensive behavior, and thus the effectiveness inquiry looks not to whether offensive behavior actually ceased but to whether the 'reme-

dial and preventative action was reasonably calculated to end the harassment.' " *Turnbull v. Topeka State Hospital,* 255 F.3d at 1245 (quoting *Adler,* 144 F.3d at 676). Viewing the actions of the Medical Center in the light of that test, its response was "reasonably calculated to end the harassment." Authorities for the Medical Center interviewed all of the appropriate parties, including Dr. Kamau. It found reason to take action with regard to Dr. Kamau. It recommended to Dr. Kamau that he submit to an evaluation of his understanding of physician/employee boundaries and actions that could be considered harassment. It informed him that his failure to follow up with this recommendation could result in termination of his staff privileges. And it directed Dr. Kamau to send a letter of apology to plaintiff.

On November 4, 1999, apparently in compliance with directions from the Committee, Dr. Kamau sent a letter to plaintiff in which he stated that he "never intended any of my actions to be offensive, sexual or otherwise." He asked that she "[p]lease accept this as my apology, and I profusely regret that you interpreted any conduct on my part as sexual harassment." However, Dr. Kamau denied in the letter that he had touched her in the manner that she had described to the hospital authorities.

Contrary to plaintiff's assertions, the Medical Center is not required to subject Dr. Kamau to "discipline" in order to satisfy its obligations to take prompt and effective remedial action, although Dr. Kamau and others might argue that the actions of the hospital in response to plaintiff's complaint, in fact, did constitute "discipline." The Medical Center is required to take only such measures as are reasonable and appropriate in the particular circumstances. In the circumstances presented by plaintiff's testimony, the actions taken

by the Medical Center with regard to Dr. Kamau satisfy this test. The response of the hospital authorities served to alert Dr. Kamau to the fact that his conduct was considered unwelcome by at least one employee, directed Dr. Kamau to engage in an educational activity that would enhance his understanding of the issue of sexual harassment, compelled Dr. Kamau to apologize to plaintiff, and warned Dr. Kamau that his failure to comply with the terms of the Medical Center's directives could result in termination of his staff privileges. The effectiveness of the hospital's measures is demonstrated by the fact that plaintiff has presented no evidence that any further incidents occurred, either between Dr. Kamau and plaintiff, or between Dr. Kamau and any other employee.

## CONCLUSION

Plaintiff has failed to demonstrate that any genuine issue of material fact exists with regard to any of the issues that are raised by the record in this case. No reasonable juror could conclude, based upon the undisputed facts that are before the court, that Dr. Kamau was an employee of the Medical Center, that Dr. Kamau was plaintiff's supervisor, or that Dr. Kamau engaged in conduct that would constitute quid pro quo sexual harassment of plaintiff, if he was her supervisor. No reasonable juror could conclude that Dr. Kamau engaged in sexual harassment that caused plaintiff to be subjected to a hostile work environment. But even if the incidents at issue in this case were found to have been so severe or pervasive that they altered the terms and conditions of plaintiff's employment, the undisputed facts reflect that the Medical Center did not act negligently with regard to either Dr. Kamau's conduct or plaintiff's complaint. Instead, the undisputed facts demonstrate that the Medical Center acted promptly and reasonably as soon as it was informed by plaintiff that a problem existed.

It is therefore ORDERED that defendant's Motion for Summary judgment [filed January 10, 2002] is GRANTED, and all of plaintiff's claims are ordered DISMISSED.